**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4780-12T1
             A-4946-12T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

B.O. and T.E.,

 Defendants-Appellants.

_____

IN THE MATTER OF T.E.E.,

 a minor.

_____

APPROVED FOR PUBLICATION

December 19, 2014

APPELLATE DIVISION

Submitted November 18, 2014 — Decided December 19, 2014

Before Judges Reisner, Koblitz and Higbee.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Monmouth
County, Docket No. FN-13-198-12.

Joseph E. Krakora, Public Defender, attorney
for appellant B.O. (Andaiye Al-Uqdah,
Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney
for appellant T.E. (Carol A. Weil,
Designated Counsel, on the brief).

John J. Hoffman, Acting Attorney General,
attorney for respondent (Melissa H. Raksa,
Assistant Attorney General, of counsel;

Timothy P. Malone, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor T.E.E. (Lisa M. Black, Designated Counsel, on the brief).

The opinion of the court was delivered by

KOBLITZ, J.A.D.

In this consolidated matter, both parents appeal from a February 14, 2013 order finding they abused or neglected their seven-week-old infant, T.E.E. (Timmy[1]), within the meaning of N.J.S.A. 9:6-8.21(c), by causing him to suffer brain injury through partial suffocation when they both took oxycodone and the mother, B.O. (Betty), slept with Timmy in the same bed.[2] The parents argue that the eyewitness presented by the Division was so incredible and the doctor so poorly informed that the Division did not prove the parents' failure to exercise a minimum degree of care by a preponderance of the evidence. The Law Guardian joins the Division in urging us to affirm. After carefully reviewing the record in light of the contentions advanced on appeal, we affirm.

---

[1]  We use fictitious names for the parties for ease of reference and to preserve their confidentiality.

[2] The order was rendered ripe for appeal as of right after the Division of Child Protection and Permanency (Division) filed a complaint for guardianship and the judge entered a May 10, 2013 final order terminating this neglect litigation.

Defendants did not testify, nor present any other evidence at the fact-finding hearing, nor did they attend every day of the four-day hearing. The Division presented the following facts. The Division received its first referral regarding defendants on the day after Timmy was born. The reporter alleged that in June and November 2011, during her pregnancy, Betty tested positive for marijuana. Betty told the Division she did not intentionally smoke marijuana after realizing she was pregnant, but may have tested positive because she was in a car where others were smoking it. She also said she had been diagnosed with bipolar disorder but was not receiving treatment. Both parents tested negative after Timmy was born, although T.E. (Ted) did not appear for a drug test at the end of January.

In January, on a routine home check, defendants informed the Division caseworker that they had taken Timmy to the hospital because he had a fever. The child's pediatrician expressed no concerns about Timmy's care. A week later, however, on February 10, 2012, the caseworker called Betty and discovered that defendants were waiting at the pediatric intensive care unit. Betty said that morning she found Timmy, then about seven weeks old, not breathing. Betty related that she had placed Timmy in his bassinet for a nap in the morning.

When she checked on him later he had blue lips, a blanket covering his face, and was not breathing.

Two Division caseworkers met the parents at the hospital where both parents provided a similar account of what happened. Neither parent mentioned the presence of any other adult. On February 21, however, a downstairs resident of the two-family house where defendants lived contacted the Division to say that Jay, who had been staying with defendants, told her that he saw Betty "get up off the baby" on the morning of Timmy's injury. She said defendants were drug-involved and were always "messed up and nodding out." Betty acknowledged having a houseguest named Jay, but said he was not there when Timmy was hurt. Both parents admitted using marijuana recently due to the stress from Timmy's injury. Betty tested positive for marijuana and Ted tested positive for marijuana, oxycodone and oxymorphone.

Two days later Jay told the police that he met the parents through Betty's downstairs relative, and had been living with the parents for four weeks as of February 10. According to the transcribed statement given to the police, Jay told them that on the evening of February 9, defendants purchased "oxycodone, weed, [X]anax and cocaine[.]" While he did not see them use any drugs that evening or notice any drugs in the house, Jay said he had overheard defendants ordering drugs on the phone. Jay

asserted that he could also "tell they were on something" because they were "addicts." Jay told the police that the parents began to argue because Ted kept "nodding out" and was not helping Betty care for Timmy. Betty took the baby into her bedroom, and Ted slept in the living room.

Jay stated to the police that at around 1:15 p.m. on February 10,

> I knocked on the bedroom door three times and then [Betty] finally woke up and said who is it? I said it's Jay and she said come in. I watched [Betty] roll off the baby. My eyes were focused on the baby. I saw his head was a dark bluish color and his lips were purple. I screamed at her to get off him, and to look at what she did and she picked him up by his diaper screaming and she ran into the living room . . . and she put him on the couch and woke [Ted] up. [Ted] started to give him compressions on his chest and blowing into his mouth. I didn't want to be up there anymore so I went downstairs and I told everybody downstairs and somebody downstairs called 911 and then all the cops came and the ambulance came and went upstairs and gave him oxygen and then they took him to the hospital.

Dr. Steven Kairys, a child abuse specialist with thirty years of experience, who saw Timmy at the hospital every day, opined that this explanation of the deprivation of oxygen was "much more consistent as a plausible cause" for Timmy's neurological damage. Kairys wrote in his report:

> Co-sleeping is now the major cause of Sudden Infant Death Syndrome [(SIDS)] and Near

> Sudden Infant Death Syndrome [(NSIDS)] in this age child. Obviously, co-sleeping is an accidental cause of suffocation. However, it is quite concerning that the child was already an open DYFS[3] case because of marijuana smoking during pregnancy. More concerning is that the family fabricated a different story, rather than being truthful to the events that occurred.
>
> Thus, there are clear concerns for child endangerment that resulted in the major morbidity to the child.

At trial, Jay gave a description of what he had observed on February 9 and 10 that differed somewhat from his earlier account to the police. He testified that, after completing a drug rehabilitation program, he stayed with defendants from late December 2011 to February 10, 2012. During that time, he saw defendants sniff oxycodone every day and smoke marijuana on a regular basis. He maintained that he had to care for Timmy several times:

> When they were messed up, nodding out on the kitchen table, the baby screamed in the chair, I would change him. I would cover him up at night. I fell asleep a couple times in my hoodie and my jeans and I was freezing, and I'd wake up and the baby was screaming and he would be in a diaper and that's it, no blanket covering him. So I covered him up, gave him a bottle, put him back to sleep.

---

[3] The Division of Youth and Family Services, the prior name for the Division.

Jay saw defendants purchase drugs several times, and sometimes he personally gave them oxycodone as "rent[.]"

In contrast to his police statement, at trial Jay testified that he saw defendants sniff oxycodone on February 9. He heard Ted agree to buy more oxycodone, after which Ted left for a period of time. Ted was nodding off, while Betty "was still functioning." Jay admitted that he lied when he told police that he saw Betty roll off Timmy, and testified that he saw Timmy on a mattress on the floor directly behind Betty when she sat up on the mattress to open the door to the bedroom.

Jay conceded on cross-examination that, on March 3, 2012, two weeks after Jay spoke to the police about Timmy, the police arrested him and charged him with burglary after Jay stole items from defendants' apartment. He later pled guilty to an amended charge of theft, and as of trial he was in jail serving a sentence for that offense as well as an unrelated charge of heroin possession. Jay denied that his testimony was in any way motivated by the fact that defendants had reported him to the police. Jay said he still dreamed about the blue baby he saw, and that he wanted Timmy to go to a better home.

Kairys testified about the medical aspects of child abuse and neglect. Consistent with his February 28 evaluation, Kairys opined that Timmy suffered brain damage because he was deprived

of blood and oxygen for a sustained period of at least six minutes. Timmy's tests had produced no evidence of brain trauma or shaken baby syndrome, and the tests ruled out the possibility that Timmy had stopped breathing because of a vascular failure, an infection, a seizure, or a disturbance in his metabolism. Kairys could not identify within a reasonable degree of medical certainty what caused Timmy to stop breathing.

Kairys acknowledged that Timmy had tested positive for Respiratory Syncytial Virus (RSV), and that RSV could cause episodes of apnea, which is defined as not breathing for fifteen or twenty seconds. Based on his own experience and review of the literature, he did not believe that RSV had caused Timmy to stop breathing for six minutes, as there was no report of apnea or Timmy wheezing prior to February 10, and Kairys knew of no case of such severe oxygen deprivation due to RSV. In Kairys's view, Jay's allegation that Betty co-slept with Timmy while in an impaired state presented "the most plausible explanation for [Timmy's] injuries." Kairys admitted that without Jay's statements, he would have deemed the cause of Timmy's respiratory failure to be unclear.

Kairys maintained that Betty's purported discovery of Timmy with a blanket over his head was not plausible because an infant of Timmy's age lacked the motor skills to pull a blanket over

his head. Kairys testified that even if Timmy's head had been covered there would have been a sufficient amount of air available to prevent suffocation. He discussed the other diagnoses that doctors considered, and admitted that he could not rule out the possibility that Timmy had suffered NSIDS. He noted that studies suggested a correlation between this condition and co-sleeping, and that the danger would increase if the co-sleeping parent was impaired, but stated that the cause of SIDS and NSIDS remained a mystery.

Kairys testified that Timmy "had a significant brain damage from the lack of oxygen[.]" Timmy had "cerebral palsy[,]" and "was going to have all sorts of major neurological changes[.]"

Betty raises the following issues on appeal:

> I. THE FINDINGS OF ABUSE AND NEGLECT MUST BE REVERSED BECAUSE THEY WERE BASED ON UNRELIABLE, INCREDIBLE EVIDENCE SUPPLIED BY A SELF-ADMITTED LIAR AND BECAUSE DR. KAIRYS' REPORT AND TESTIMONY WERE BASED SOLELY UPON THE REPORT MADE TO DYFS.

> II. THE APPELLATE DIVISION SHOULD REVERSE THE TRIAL COURT'S RULING BECAUSE HEARSAY STATEMENTS AND DOCUMENTS, WERE IMPROPERLY ADMITTED DURING FACT-FINDING AND DISCUSSED AND RELIED UPON BY THE TRIAL JUDGE IN HIS RULING.

> III. THE TRIAL JUDGE'S RULING SHOULD BE REVERSED AS THE JUDGE RELIED UPON DR. KAIRYS['S] REPORT, WHICH WAS CONCLUSORY, FAILED TO MAKE ANY CONCLUSIONS BASED OFF OF A REASONABLE DEGREE OF MEDICAL CERTAINTY OR

PROBABILITY WHICH VIOLATES DEFENDANT'S DUE PROCESS RIGHTS.

IV. THE JUDGE ERRED BY NOT ARTICULATING WITH PARTICULARITY THE FACTS UPON WHICH A DETERMINATION OF ABUSE AND NEGLECT IS MADE AND FAILED TO IDENTIFY ALL DOCUMENTS/ EXHIBITS RELIED UPON IN REACHING HIS DECISION.

V. THE TRIAL JUDGE ERRED IN ITS RULING THAT CO-SLEEPING WITH A CHILD AMOUNTS TO GROSS NEGLIGENCE OR RECKLESSNESS.

VI. THE TRIAL JUDGE ABUSED HIS DISCRETION WHEN HE ABDICATED HIS RESPONSIBILITY TO EVALUATE WHETHER HE SHOULD SEQUESTER A DYFS SOCIAL WORKER WHOSE PRESENCE IN THE COURTROOM DURING THE TESTIMONY OF ANOTHER DYFS WORKER WOULD PREJUDICE THE DEFENSE WHEN HER TESTIMONY WAS CRITICAL IN DETERMINING CREDIBILITY.

Ted raises these issues:

I. THE FINDING OF ABUSE AND NEGLECT AS TO DEFENDANT-APPELLANT MUST BE REVERSED BECAUSE THE TRIAL COURT MISCHARACTERIZED THE EVIDENCE AND ASSUMED FACTS NOT IN EVIDENCE.

II. THE FINDING THAT THE CHILD IS ABUSED AND NEGLECTED AS DEFINED BY THE STATUTE MUST BE REVERSED BECAUSE THE DIVISION DID NOT PROVE THAT THE FATHER FAILED TO PROVIDE THE MINIMUM DEGREE OF CARE.

To prevail in a Title 9 proceeding, the Division must show by a preponderance of the competent and material evidence that the defendant abused or neglected the affected child. N.J.S.A. 9:6-8.46(b); N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 32 (2011). The Division need only show that it was

more likely than not that the defendant abused or neglected the child. See N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 615 (App. Div. 2010).

Title 9 defines an "abused or neglected child" as a child less than eighteen years of age, whose parent or guardian:

> (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; [or] (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ . . . .
>
> [N.J.S.A. 9:6-8.21(c) (emphasis added).]

The phrase "accidental means" in this provision refers to "the events leading up to the injury and not the resulting injury itself." G.S. v. Dep't of Human Servs., 157 N.J. 161, 174 (1999) (citation omitted). "Where an action is deliberate, and the actor can or should foresee that his conduct is likely to result in injury, as a matter of law, that injury is caused by 'other than accidental means.'" Id. at 175 (citations omitted). The parent's intent is irrelevant. Ibid. (citations omitted).

The definition of an "abused or neglected child" also encompasses:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired <u>as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care</u> . . . by . . . acts of a . . . serious nature requiring the aid of the court[.]
>
> [<u>N.J.S.A.</u> 9:6-8.21(c)(4) (emphasis added).]

"Where an action is deliberate, and the actor can or should foresee that his conduct is likely to result in injury, as a matter of law, that injury is caused by other than accidental means." <u>G.S.</u>, <u>supra</u>, 157 <u>N.J.</u> at 174 (citations and internal quotation marks omitted).

The requisite measure of neglect in Title 9 matters is higher than that of ordinary negligence. <u>Id.</u> at 178. By isolating acts that fail to adhere to a "minimum degree of care," the statute seeks only to capture conduct that is "grossly or wantonly negligent, but not necessarily intentional." <u>Ibid.</u> (citation omitted); <u>see also</u> <u>N.J. Div. of Youth & Family Servs. v. J.L.</u>, 410 <u>N.J. Super.</u> 159, 167-68 (App. Div. 2009) (affirming that inattentive or merely negligent conduct does not constitute willful or wanton misconduct as required by Title 9). Under this intermediate standard, a parent is culpable if he or she acts "with the knowledge that

injury is likely to, or probably will, result" in serious injury, or acts with a reckless disregard for the consequences of his or her actions. G.S., supra, 157 N.J. at 178.

The trial judge held that co-sleeping with an infant when the parent is in an impaired state constitutes an act of gross negligence. The judge found Betty was neglectful by co-sleeping with her seven-week-old infant while under the influence of illegal drugs. The judge also found Ted neglectful by knowingly allowing this sleeping arrangement while Betty was impaired.

Defendants argue that because the medical expert's opinion, that Timmy was probably injured due to co-sleeping with Betty, depends on facts set forth only by Jay, who is not credible, the Division did not prove its case. Defendants argue that Jay's testimony is so demonstrably incredible that we should reverse the trial judge's findings. In State v. Elders, where our Supreme Court reinstated the trial judge's decision to deny the defendant's motion to suppress after holding a plenary hearing, Justice Albin wrote:

> An appellate court should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy. An appellate court should not disturb the trial court's findings merely because it might have reached a different conclusion were it the trial tribunal or because the trial court

decided all evidence or inference conflicts in favor of one side in a close case. A trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction. In those circumstances solely should an appellate court appraise the record as if it were deciding the matter at inception and make its own findings and conclusions.

[State v. Elders, 192 N.J. 224, 244 (2007) (citations and internal quotation marks omitted).]

As demonstrated by defense counsel during cross-examination, Jay's testimony could have reasonably been rejected by the trial judge. Jay was in prison for stealing from defendants, which gave him a motive to lie in retaliation for their reporting him to the police. We note, however, that Jay first spoke to the police before the theft occurred. Jay also did not seek out the Division to cast blame on the parents, but was found after the downstairs neighbor reported Jay's comments to the Division. Jay gave differing versions of what happened to the downstairs neighbor, the police, the Division and finally under oath to the trial court. Jay's admission that he supplied defendants with drugs and smoked marijuana with them was not initially told to the police or the Division. His statement that he saw Betty "roll off" Timmy was recanted in court.

The fact that Jay was living with defendants for an extended period of time and that defendants did not mention

14                                                           A-4780-12T1

Jay's existence when they reported the events adds credibility to Jay's testimony. The parents' version of events was not given under oath nor subjected to the rigors of cross-examination. In a criminal case, where the standard of proof is beyond a reasonable doubt, one could argue that "it is better that ten guilty persons escape, than that one innocent suffer." United States v. Schwimmer, 882 F.2d 22, 27-28 (2d Cir. 1989), cert. denied, 493 U.S. 1071, 110 S. Ct. 1114, 107 L. Ed. 2d 1021 (1990) (citation and internal quotation marks omitted). When the welfare of a defenseless baby is at stake, and the burden of proof is more probable than not, different considerations apply. A neglectful parent is a serious danger to an infant. We must be particularly vigilant not to improperly interfere with the credibility determinations of the trial judge where the danger to an innocent party of an incorrect determination is so severe. We owe great deference to the assessment of the trial judge, particularly in light of the expertise of the family court. Cesare v. Cesare, 154 N.J. 394, 412 (1998).

The trial judge explained why he found Jay credible, determining that Jay was genuinely concerned for Timmy's welfare and that inconsistencies in his version of events were understandable given his desire to hide his drug involvement from the police. Jay was not promised anything by the

authorities for his testimony. The judge found that Jay was truthful in his courtroom testimony, although, overwhelmed by the sight of the injured baby, he had exaggerated initially when speaking to the police. The judge also believed Jay's testimony because it was consistent with Kairys's understanding of what probably caused the injury to Timmy.

Our trial system is built on the premise that fact-finders are able to view a witness, watch direct and cross-examination, and decide whether the witness was truthful when making those statements that are crucial to the decision-making. A fact-finder is not required to reject the entire testimony of a witness who willfully lies about some facts. State v. Ernst, 32 N.J. 567, 583-84 (1960), cert. denied, 364 U.S. 943, 81 S. Ct. 464, 5 L. Ed. 2d 374 (1961); see Model Jury Charge (Criminal), "False in One — False in All" (2013). A witness who gives a prior inconsistent statement may well be believed by the factfinder when he testifies in court. See Model Jury Charge (Criminal), "Prior Contradictory Statements of Witnesses (Not Defendant)" (1994). We therefore defer to the trial judge's finding that Jay was credible.

Ted's argument that he did nothing wrong because he did not sleep with Timmy is unpersuasive. A parent's failure to act in circumstances that demand action is the essence of neglect. See

In re Guardianship of K.H.O., 161 N.J. 337, 351-53 (1999) (stating that a mother's failure to provide continuing care for her child or to take any measures to relieve her child's suffering satisfied the first prong of the statutory test); In re Guardianship of D.M.H., 161 N.J. 365, 379-80 (1999) (finding harm where a father's failure to act "compounded the mother's neglect and contributed to the circumstances that" led to removal); In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (finding that "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights") (citation omitted); N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 436 (App. Div. 2009) (stating that a mother harmed her children by permitting the father into the home in violation of court orders). If Jay's testimony is credited, Ted participated in drug use with Betty and was aware that Betty slept with Timmy, thus failing to protect Timmy.

Parents who use illegal drugs when caring for an infant expose that baby to many dangers due to their impaired judgment. See N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 331 (App. Div. 2011) (commenting that, unlike an infant, the twelve-year-old child was not vulnerable "to the slightest

parental misstep" when visiting in a Division-supervised setting with her father, who tested positive for drugs). Timmy was completely dependent on his parents to protect him from danger. Although a sober parent could also inadvertently smother a baby when co-sleeping, a parent who falls asleep after ingesting illegal drugs is less likely to exercise good judgment in protecting the baby in bed.[4] Just as a sober driver may have an automobile accident, an impaired driver is much more likely to do so.

The parents raise issues relating to the admission of unspecified hearsay statements embedded in Division records. Such evidence may not be admitted unless it satisfies an exception to the hearsay rule. State v. Long, 173 N.J. 138, 152 (2002). Rule 5:12-4(d), however, specifically provides that the Division may "submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants[,] [and that] [c]onclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal." The trial judge in his oral opinion stated that

---

[4] To be clear, the trial judge did not find that co-sleeping constitutes child abuse or neglect, and neither do we. The issue presented in this case is co-sleeping with an infant while under the influence of illegal drugs.

he was not considering inadmissible hearsay contained in the Division documents.

The Division's central fact witness, Jay, testified based on his personal knowledge. The Division's expert witness, Kairys, also testified based on his observations and review of the records. A trial court's evidentiary rulings will not be disturbed unless they constitute an abuse of discretion resulting in a manifest error or injustice. Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008). The trial judge did not abuse his discretion by admitting hearsay contained in the testimony and documents. Any other issues not addressed by us in this opinion are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4780-12T1