# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0642-15T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.D.,

    Defendant-Appellant,

and

S.R. and J.M.,

    Defendants.

_____

IN THE MATTER OF
A.D.-R and N.R., minors.

_____

Submitted February 9, 2017 — Decided  March 15, 2017

Before Judges Lihotz and O'Connor.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Burlington
County, Docket No. FN-03-200-15.

Joseph P. Grimes, attorney for appellant.

Christopher S. Porrino, Attorney General,
attorney for respondent (Melissa Dutton

Schaffer, Assistant Attorney General, of counsel; James R. Griffin, Jr., Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

In this Title 9 matter filed by plaintiff, the Division of Child Protection and Permanency (the Division), defendant A.D. appeals from an order, filed on June 17, 2015. Following a fact-finding hearing, the judge concluded A.D.'s conduct rose to neglect as defined by N.J.S.A. 9:6-8.21(c)(1), resulting in the death of her four-month old infant. We affirm.

The facts are undisputed. A.D. gave birth to twins, who arrived five weeks early. A.D. and other family members resided in the twins' paternal grandmother's home. On January 22, 2015, the twins were cared for by A.D. Sometime after 4:00 a.m., the twins' father awoke to use the bathroom. On his way back to bed, he checked the twins and observed A.D. asleep on the couch and one infant laying face-down on A.D.'s chest. When he lifted the child to place her in a crib, her body was unresponsive. He initiated mouth-to-mouth resuscitation and emergency personnel were called. The infant could not be revived.

Responding police officers recorded an odor of alcohol emanating from A.D.'s breath. A.D. was taken to the hospital and

a blood test was conducted, the results of which were not introduced.

The Burlington County Medical Examiner, Ian Hood, M.D., testified as an expert on behalf of the Division, during the fact-finding hearing. He stated the infant had been dead for a "few hours" when she was discovered, which is why resuscitation efforts "were hopeless." The infant's death did not result because she was premature; she was determined to be "robust, well-nourished and apparently well cared for[,]" with no abnormality, trauma, or illness discovered. The cause of death was considered a sudden unexplained death of a co-sleeping infant, which resulted from the lack of findings of any other cause of death. Dr. Hood stated, "the incidence of sudden unexplained death is anywhere from 10 to 20 times more common when an infant is co-sleeping with somebody else," distinguishing those deaths "from regular SIDS where a baby dies on its [sic] own . . . ." Although the studies vary on the amount of increase, all studies show "a great increase" in the incidence of sudden infant death in cases involving co-sleeping. This occurs because people move in their sleep, making the likely cause of death suffocation or compression. The manner of death changes from "natural for [sudden infant death] to undetermined because we cannot exclude some kind of accidental overlying or the mother's arm going over the child's body while the child was on

her chest." This problem becomes more common when the co-sleeping parent is impaired. He understood neonatal units have begun instructing parents not to co-sleep and to place the baby on his or her back when sleeping.

Dr. Hood explained he could not state the infant suffocated, but that cause of death could not be excluded because suffocation "does not leave findings a pathologist can find at autopsy." One sign is discoloration of the brain tissue, which turns "dusky plum purple." This was found in his autopsy of the infant; however, the same condition is observed "in anyone who's had resuscitation attempted for nearly an hour," which happened in this case.

The Division's caseworker, who responded when called by police, also testified. In discussing her investigation, she recounted her interview with A.D. A.D. had stayed with the twins' father's family for several days. The caseworker recalled A.D. and her father argued earlier in the day, when he came to the twins' father's residence because A.D. had not been home for several days. The disagreement centered on A.D.'s drinking.

A.D. remembered consuming alcohol prior to her father's visit, in the nature of two "airplane" sized bottles of liquor, one of tequila and another of amaretto. She also was drinking regularly during the days leading to this event.

Following the argument, A.D. went to bed around 6 p.m. and woke at 11 p.m. The twins' father retired around 12:30 a.m. and asked A.D. to care for the twins because he needed sleep. A.D. "remembers being somewhat aggressive with the baby and thinking please stop but . . . didn't remember picking the baby up in the middle of the night." She also remembered she began drinking after the father went to sleep and drank more than she had the prior nights. When she awoke the next morning, she saw a half-empty bag from a box of white wine next to the couch. A.D. admitted when the father cared for the children, she would "binge drink to the point that she was having some issues remembering what she was doing." A.D. further reported "she [wa]s a different person when she drinks," acting "more aggressive." Finally, A.D. admitted taking Klonopin[1] pills prescribed for the twins' father, but denied she did so on the night she was caring for the infants.

The infants' father was also interviewed and testified during the hearing. He arrived home from school at 2:30 p.m. and "everything seemed fine." He reported, after A.D.'s father left,

---

[1] Klonopin (clonazepam) is a benzodiazepine, used to treat certain seizure and panic disorders. The Food and Drug Administration cautions "Klonopin can make you sleepy or dizzy and can slow your thinking and motor skills[,]" and specifically cautions against drinking alcohol while taking Klonopin. Food & Drug Administration, Medication Guides, Ref. No. 4028890, Klonopin® Tablets (clonazepam) (2016) at 20.

she took a nap. A.D. awoke at 9 p.m., at which time she appeared to be "clear, alert and oriented." Before he went to sleep, the infants' father made bottles for the twins, who were awake and in their respective carriers. He heard the twins, "giggling and interacting with [A.D.]" as she watched television while lying on the couch. When he awoke and found the baby unresponsive, he shook A.D., whose eyes looked like she was "smashed." As he administered CPR to the baby, he asked A.D. to call 9-1-1; instead she texted 9-2-2.

The twins' father also reported that, during A.D.'s stay, he found empty bottles of alcohol, including two empty bottles of wine on one day and an empty six-pack of beer the next. He also was concerned because he discovered three of his prescribed Klonopin pills were missing. The twins' father stated A.D. was drinking the nights prior to the incident, because he was responsible to care for the twins. His trial testimony that A.D. was not drinking the day of the baby's death differed from his interview statements the day his child died.

Without objection, the Division introduced three reports, the infant's autopsy report authored by Dr. Hood; the caseworker's investigative summary, and the Division's screening summary. A.D. did not testify.

Following summations, the judge issued his findings and conclusions in a bench opinion. He found Dr. Hood's testimony "fair," very credible, articulate, and well prepared. The Division's caseworker was also found credible, did not embellish her testimony, and "tried to be as accurate as possible." Finally, as to the infants' father, the judge noted his responses tended to "get as much information as he can to the [c]ourt . . . in the framework of the question but tended to go beyond the question. And so for that his credibility [wa]s not as strong. . . ."

Evaluating the evidence, the judge found A.D.'s conduct rose to gross negligence because she acted with knowledge her conduct was likely to result in serious injury to the infant. A.D.'s consumption of alcohol while charged with the care of the infant and deciding to co-sleep with the baby on the couch resulted in the infant's death. A.D. was aware of her binge drinking and its effects: she had attended Alcohol Anonymous, related she becomes aggressive when she drinks, and frequently blacks out. Notwithstanding her agreement to be responsible to care for the infants, she began drinking and placed one crying infant, face down, atop her as she fell asleep on the couch.[2]

---

[2] The judge concluded the Division's evidence was insufficient to prove the infants' father engaged in conduct causing abuse or neglect.

Thereafter, the judge conducted a dispositional hearing, ordering services extended to A.D. and the infants' father. Ultimately, the case was concluded on September 1, 2015, and A.D. filed this appeal.

Our standard of review on appeal is narrow.

> "[F]indings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 433 (App. Div. 2002) (citing Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Deference to a trial court's supported factual findings is warranted because the trial judge "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand [and] . . . has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008).
>
> [N.J. Div. of Youth & Family Servs. v. S.I., 437 N.J. Super. 142, 152 (App. Div. 2014).]

This scope of review is expanded when "the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom . . . .'" N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)). On the other hand, a trial judge's legal conclusions and the application of those conclusions to the facts

are always subject to our plenary review.  S.I., supra, 437 N.J. Super. at 152.

> The adjudication of abuse or neglect is governed by Title 9, which is designed to protect children who suffer serious injury inflicted by other than accidental means. G.S. v. Dep't of Human Servs., 157 N.J. 161, 171 (1999) (citing N.J.S.A. 9:6-8.8).  See also N.J.S.A. 9:6-8.21 to -8.73 (governing protection of abused and neglected children). "The statute in question addresses harm to a child[.]" [N.J. Div. of Youth & Family Servs. v. ]A.L., 213 N.J. [1,] 8 [(2013)].
>
> [Ibid.]

An "abused or neglected child" is defined in N.J.S.A. 9:6-8.21(c) as

> a child less than 18 years of age whose parent or guardian, as herein defined, . . . (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; . . . (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, . . . .

Whether a parent or guardian has engaged in acts of abuse or neglect is considered on a case-by-case basis and must be "analyzed

in light of the dangers and risks associated with the situation." N.J. Dep't of Children & Families v. R.R., 436 N.J. Super. 53, 58 (App. Div. 2014) (quoting G.S., supra, 157 N.J. at 181-82). The Division must prove the conduct is "something more than ordinary negligence" to prove liability. G.S., supra, 157 N.J. at 178. Indeed, "[o]ne act may be substantial or the sum of many acts may be substantial" to prove abuse or neglect. N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 330 (App. Div. 2011) (citation omitted).

A court considering whether a parent or guardian's conduct meets the statutory standard must analyze all facts, id. at 329, and decide whether the parent or guardian exercised a minimum degree of care under the circumstances. N.J. Div. of Child Prot. & Permanency v. J.A., 436 N.J. Super. 61, 69 (App. Div. 2014). In doing so, we recognize "the elements of proof are synergistically related." V.T., supra, 423 N.J. Super. at 329 (citation omitted).

In reviewing N.J.S.A. 9:6-8.21(c)(2),

> [t]he phrase "accidental means" in this provision refers to "the events leading up to the injury and not the resulting injury itself." G.S. [supra,], 157 N.J. [at] 174 (citation omitted). "Where an action is deliberate, and the actor can or should foresee that his conduct is likely to result in injury, as a matter of law, that injury is caused by 'other than accidental means.'" Id. at 175 (citations omitted). The parent's

10

intent is irrelevant. Ibid. (citations omitted).

> [N.J. Div. of Child Prot. & Permanency v. B.O., 438 N.J. Super. 373, 381 (App. Div. 2014).]

In carrying its burden of proof, the Division's proofs must "demonstrate by a preponderance of the competent, material and relevant evidence the probability of present or future harm" to the minor child. N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004) (citation omitted), certif. denied, 182 N.J. 426 (2005); see also N.J.S.A. 9:6-8.46(b). Under this standard, "[t]he Division need only show that it was more likely than not that the defendant abused or neglected the child." B.O., supra, 438 N.J. Super. at 380 (citing N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 615 (App. Div. 2010)).

A.D. argues the trial judge erred because there is no proof her conduct caused the infant harm, citing A.L., supra, 213 N.J. 1. In a related argument, she states the trial judge misapplied the standard for abuse or neglect because there was no actual evidence of A.D.'s blood alcohol level to demonstrate gross negligence. We reject these contentions.

The facts presented in A.L., are distinguishable from those presented in this matter. In A.L., the Division proved the defendant mother used illicit substances, but did not show that

drug use caused actual harm to her baby, which was born without any discernable problems. Id. at 9. The Court concluded the statutory requirements of N.J.S.A. 9:6-8.21(c) require the Division to demonstrate actual harm or to show the likelihood of an imminent substantial risk of harm rising above mere negligence, by the parent's conduct. Id. at 28. "Judges at the trial and appellate level cannot fill in missing information on their own or take judicial notice of harm. Instead, the fact-sensitive nature of abuse and neglect cases, turns on particularized evidence." Ibid.

Here, Dr. Hood determined the cause of death was co-sleeping, sudden infant death. Other direct and circumstantial evidence shows, for at least three days, A.D. drank heavily; she took at least three Klonopin tablets, a benzodiazepine which was not prescribed for her. Even though she agreed to care for the infants between 12:30 a.m. and the time the baby expired (stated as approximately 1:30 to 2:30 a.m.), A.D. drank one-half of a bag of boxed wine, drinking more than she had the prior nights. The substance abuse caused her to black out, such that she could not clearly remember what she did, although she recalled the baby was fussy and she wanted her to stop crying. She could not remember removing the baby from her carrier, but had a recollection of being aggressive with the baby. A.D. lost consciousness and did

not return the baby to her carrier, instead she chose to co-sleep with her on the couch, while intoxicated, laying the infant face down.  Moreover, her intoxication was so pronounced, A.D. never realized the baby stopped breathing and could not even summon help when the infants' father shook her awake.

"Parents who use illegal drugs when caring for an infant expose that baby to many dangers due to their impaired judgment." B.O., supra, 438 N.J. Super. at 385 (citing V.T., supra, 423 N.J. Super. at 331) (commenting infants are susceptible to even slight "parental missteps").  "Although a sober parent could also inadvertently smother a baby when co-sleeping, a parent who falls asleep after ingesting illegal drugs is less likely to exercise good judgment in protecting the baby in bed.  Just as a sober driver may have an automobile accident, an impaired driver is much more likely to do so."  Ibid.  (footnote omitted).

Unlike the mother in A.L., whose baby suffered no proven effect from prenatal drug use, in this matter, as a result of A.D.'s intoxication, she placed the baby face down, which resulted in the infant's death.  While A.D. may not have intended harm to the baby, she deliberately became intoxicated to the point of not knowing what she was doing.  This non-accidental conduct led to the tragically harmful result.  See, e.g., G.S., supra, 157 N.J. at 174; B.O., supra, 438 N.J. Super. at 381.

The trial judge's findings are supported by the credible evidence in the record.  The conclusion of neglect will not be disrupted.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0642-15T3