RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-4795-14T1
 A-4796-14T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

J.B. and T.L.,

 Defendants-Appellants.
_____________________________

IN THE MATTER OF T.B.,

 Minor.
_____________________________

 Argued May 17, 2017 – Decided July 13, 2017

 Before Judges Alvarez and Accurso.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Bergen
 County, Docket No. FN-02-298-13.

 Steven E. Miklosey, Designated Counsel,
 argued the cause for appellant J.B. (Joseph
 E. Krakora, Public Defender, attorney; Mr.
 Miklosey, on the brief).

 Andrew J. Shaw, Designated Counsel, argued
 the cause for appellant T.L. (Joseph E.
 Krakora, Public Defender, attorney; Mr.
 Shaw, on the brief).
 Ellen L. Buckwalter, Deputy Attorney
 General, argued the cause for respondent
 (Christopher S. Porrino, Attorney General,
 attorney; Andrea M. Silkowitz, Assistant
 Attorney General, of counsel; Ms.
 Buckwalter, on the brief).

 Nancy P. Fratz, Assistant Deputy Public
 Defender, argued the cause for minor T.B.
 (Joseph E. Krakora, Public Defender, Law
 Guardian, attorney; Ms. Fratz, on the
 brief).

PER CURIAM

 Defendants T.L. (Tina) and J.B. (Jim)1 appeal from an

October 31, 2013 order of the Family Part, now final, finding

they placed their infant daughter at substantial risk of harm by

regularly abusing drugs while she was in their care in violation

of N.J.S.A. 9:6-8.21c(4)(b).

 Although the Law Guardian joined with the Division of Child

Protection and Permanency in urging the trial judge to find

defendants abused and neglected their daughter, a different

assistant deputy public defender serving as Law Guardian on

appeal has altered course and now joins with defendants in

urging us to reverse. Because we agree with the Division that

substantial credible evidence in the record supports the trial

1
 We refer to defendant parents by fictitious names in order to
protect the privacy of their daughter.

 2 A-4795-14T1
judge's finding of neglect, we affirm, substantially for the

reasons expressed by Judge Foti in her clear and concise opinion

from the bench.

 Only two witnesses testified at the fact-finding hearing,

the Division employee responsible for investigating the abuse

and neglect allegations and Dr. Hayman Rambaran, M.D., the

Director of the Addiction Treatment Unit of Bergen Regional

Medical Center.

 The investigator testified, based on the screening summary

and her investigation report admitted in evidence, that the

Division received a referral on January 30, 2013, alleging

defendants were using heroin and pills on an almost daily basis

while caring for their infant daughter. The referent claimed

Jim was unemployed and had gone to rehab but was using again,

and that Tina had just been fired from her job. According to

the referent, the couple had twice been evicted for failure to

pay rent, were staying with a friend and taking the baby when

they went to buy drugs in Paterson and Newark.

 Although the Division made repeated efforts to contact

defendants on the 30th, the investigator did not catch up with

them until the following day. She found them in the emergency

room of Bergen Regional attempting to enter a detox program.

Tina told the investigator they had signed over temporary

 3 A-4795-14T1
custody of the baby, then eleven months old, to her sister while

they sought treatment. She also claimed she and Jim had been on

a waiting list for treatment "since last week."

 Both Tina and Jim were cooperative with the Division and

freely admitted their drug use. Tina told the investigator she

had been using marijuana, cocaine "and pain killers called Roxy"

a few times a week for the last four to five months. She

claimed she did not use drugs while caring for her daughter, but

admitted they were likely still in her system when she was with

the baby. Tina also told the investigator she and Jim did not

use drugs together. Indeed, she claimed neither was aware of

"how much the other was using until recently," although she

acknowledged both she and Jim "had an idea that the other was

using drugs."

 Jim told the investigator he had attended rehab for almost

six weeks in Florida at the end of the summer and had been

"clean" until December. He admitted he had been using Roxy for

two months, but denied daily use or that he was taking any other

drugs. Jim claimed to be responsible for watching the baby

"full time," and, like Tina, denied using drugs when the infant

was in his care. He told the investigator he used drugs when

Tina was with the baby, that the two "rarely use[d] together"

and "tend[ed] to do their own thing." The parties stipulated a

 4 A-4795-14T1
Division supervisor would testify that Jim told her he had

attention deficit hyperactivity disorder and had had "a drug

problem for some time." According to the supervisor, Jim told

her he had been "using six to seven pills of Roxy, 30 milligrams

each and every day for the last few months."

 The investigator testified she visited the baby and found

her appropriately dressed, playing and smiling and apparently

well cared for. A check with the baby's doctor revealed she had

been seen nine times in her eleven months, only once for a sick

visit, and was up to date with her immunizations.

 Dr. Rambaran testified regarding Tina's and Jim's

participation in Bergen Regional's detox program, the drugs they

were using and the effect of those drugs at the level defendants

reported taking. The doctor explained the importance of getting

an accurate account from persons entering the detox program of

the drugs used, "how much they're using, [and] how often" in

order to "decide upon their treatment." He also explained that

people coming into the detox program are "in withdrawal, it

means the . . . drug is getting out of their system, and we're

seeing the signs of the lack of that substance which they are

accustomed to using."

 The doctor related that Tina, who was then twenty-six years

old, reported using cocaine, marijuana and "Roxies," which he

 5 A-4795-14T1
explained were synthetic opiates branded as Roxicet or

Roxicodone. According to the doctor, Tina reported she had been

taking 100 to 300 milligrams of Roxy a day for two years without

a prescription. He also testified that in addition to testing

positive for opiates and cocaine on admission, Tina also tested

positive for benzodiazepine, which she had not disclosed using.

 Dr. Rambaran testified that Jim, then twenty-four, claimed

on entering the program that he had been using cocaine since he

was seventeen years old. He told Dr. Rambaran that he took 300

milligrams of Roxy a day, most recently the day before his

admission, and used two grams of cocaine every day. Jim's blood

test was consistent with that report.

 On questioning from the court, Dr. Rambaran explained that

Roxicet or Roxicodone are derivatives of morphine and are

analgesics that cause euphoria. He testified that a person

taking 100 to 300 milligrams of Roxy a day would likely suffer

mental and physical impairment that would affect the

individual's judgment and reflexes. A person's reaction time

would slow and he or she would "get into the range" of risking

overdose, causing a depressing of their respiratory center. The

doctor also noted that combining an opiate, like Roxy, with a

stimulant like cocaine "definitely . . . becomes more complex

because of the receptors in the brain and how these work in

 6 A-4795-14T1
different ways." In addition to the risk of overdose, the drugs

react synergistically, making the effect "difficult to

accurately predict." The doctor, however, noted it would

"definitely not [be] conducive to one having, you know, good

judgment and being able to act in a, you know, prudent manner."

 After hearing that testimony and accepting the Division's

documents and the medical records in evidence, the court invited

argument. Counsel for each of defendants argued the only thing

the Division had proved was defendants' drug use, which both the

Supreme Court in New Jersey Department of Children & Families v.

A.L., 213 N.J. 7, 23 (2013), and this court in New Jersey

Division of Youth & Family Services v. V.T., 423 N.J. Super.

320, 330-31 (App. Div. 2011), had declared was "not enough" to

establish abuse and neglect. They claimed the Division

presented no proof that either parent was under the influence

while caring for their daughter. Defendants' counsel emphasized

the child was well-cared for, that neither parent ever admitted

using drugs when caring for her and that both parents had

already signed themselves into treatment and arranged for care

of the baby before the Division ever got involved in this

matter.

 The Law Guardian argued the case was not about whether Tina

and Jim were "horrible parents," but whether "their actions,

 7 A-4795-14T1
before the Division got involved, put their child at a

substantial risk of harm." Noting the doctor's testimony

regarding the danger of using cocaine and opiates, as both

parents admitted doing for, at least, several months prior to

the Division's involvement, the Law Guardian asserted "the risk

of harm was substantial." Focusing on the child, the Law

Guardian argued, "[j]udge, we're talking about an infant who is

not able to care for herself, dealing with the situation where

her parents' judgment is impaired by – based on the level of

drugs that were being used, and the combination of drugs that

are being used." Based on the evidence in the record, the Law

Guardian joined with the Division in asking that the court "make

a finding."

 Relying on a then recent unpublished decision of this

court, the Division argued that "an ordinary reasonable person"

would understand the risks posed to an infant by her parents'

regular use of cocaine and opiates. Defendants' disregard of

that risk, and its potential serious consequences for their

child, could only mean they acted with reckless disregard for

her safety. Notwithstanding defendants' voluntary decision to

go into detox at the time of the referral, the Division

contended it had carried its burden to prove "this child was

placed at a substantial risk of harm based on the risks inherent

 8 A-4795-14T1
in the parents' drug use for the extended period of time and the

levels that they were taking."

 After weighing the evidence and the arguments of counsel,

Judge Foti entered an order finding defendants had neglected

their infant daughter. In a clear and comprehensive decision,

she summarized the critical testimony, identified the pertinent

law and explained its application to the facts as she found

them. Relying on G.S. v. Department of Human Services, 157 N.J.

161, 181-82 (1999), the judge noted "that whether a parent or

guardian has failed to exercise a minimum degree of care is to

be analyzed in light of the dangers and the risks associated

with the acts involved," here, drug use while responsible for

the care of an infant.

 The judge distinguished both A.L. and V.T., relied upon by

defendants, on their facts. She deemed A.L. inapplicable

because, while that case involved a newborn, the issue was the

mother's use of cocaine during her pregnancy, not, as here,

while caring for the newborn. See 213 N.J. at 27-28. The judge

similarly found V.T. inapposite because there the father tested

positive for drugs during his supervised visitation of his

eleven-year-old daughter, not while he was alone responsible for

her care. See 423 N.J. Super. at 331. Judge Foti noted,

however, that in addition to the supervised setting, we also

 9 A-4795-14T1
found the age of the child significant in V.T., observing that,

"[u]nlike with an infant, [the child] was not vulnerable during

[the supervised] visits to the slightest parental misstep."

Ibid.

 Based on defendants' admissions regarding the amount and

type of drugs they had been using, Judge Foti found that at the

time of the referral both were abusing drugs and had been doing

so for a significant period of time. The judge continued:

 They were drug addicted such that they
 entered a five-day detox program. They were
 abusing drugs at the time they were primary
 caretakers for an 11-month-old baby, and
 they admitted as such.

 Being under the influence of drugs
 while acting in a caretaking role placed
 [their daughter] at substantial risk of
 harm. The mother and father were impaired.
 The doctor testified as to the effects of
 the drugs taken by the parents. There was a
 risk of overdose while caring for this young
 child. A person's judgment, movement, and
 reflexes are impaired. An impaired parent
 caring . . . for a child, especially in this
 case, a young child, places this child at
 risk of harm.

 Under the circumstances where an
 ordinary and reasonable person would
 understand that the situation poses risks,
 but nonetheless acts without regard for the
 potentially serious consequences, that
 person acts – that parent acts with reckless
 disregard for the safety of his, her young
 child.

 10 A-4795-14T1
 The Division has met its burden. The
 facts and law support a finding in this
 matter. The court finds that by virtue of
 their drug abuse while acting in a
 caretaking role, this amounted to gross
 negligence. The parents placed their child
 at substantial risk of harm, and I will make
 that finding.

 Defendants reprise the arguments they made to the trial

court, now joined by the Law Guardian on appeal, that there was

insufficient evidence to support a finding of abuse and neglect.

We disagree.

 Title 9 defines an "abused or neglected child" as including

 a child whose physical, mental, or emotional
 condition has been impaired or is in
 imminent danger of becoming impaired as the
 result of the failure of his parent or
 guardian, as herein defined, to exercise a
 minimum degree of care (a) in supplying the
 child with adequate food, clothing, shelter,
 education, medical or surgical care though
 financially able to do so or though offered
 financial or other reasonable means to do
 so, or (b) in providing the child with
 proper supervision or guardianship, by
 unreasonably inflicting or allowing to be
 inflicted harm, or substantial risk thereof,
 including the infliction of excessive
 corporal punishment; or by any other acts of
 a similarly serious nature requiring the aid
 of the court[.]

 [N.J.S.A. 9:6-8.21c(4).]

 In G.S., the Court explained that "a minimum degree of

care" denoted

 11 A-4795-14T1
 a lesser burden on the actor than a duty of
 ordinary care. If a lesser measure of care
 is required of an actor, then something more
 than ordinary negligence is required to hold
 the actor liable. The most logical higher
 measure of neglect is found in conduct that
 is grossly negligent because it is willful
 or wanton.

 [157 N.J. at 178.]

Willful or wanton conduct includes those actions "done with the

knowledge that injury is likely to, or probably will, result."

Ibid. "Essentially, the concept of willful and wanton

misconduct implies that a person has acted with reckless

disregard for the safety of others." Id. at 179. The Court

likewise held that "[b]ecause risks that are recklessly incurred

are not considered unforeseen perils or accidents in the eyes of

the law, actions taken with reckless disregard for the

consequences also may be wanton or willful." Id. at 178.

 Although the Court in G.S. noted the difference between

negligence and willful and wanton conduct cannot be clearly

delineated in all cases, it made clear that

 [w]here an ordinary reasonable person would
 understand that a situation poses dangerous
 risks and acts without regard for the
 potentially serious consequences, the law
 holds him responsible for the injuries he
 causes. Thus, under a wanton and willful
 negligence standard, a person is liable for
 the foreseeable consequences of her actions,
 regardless of whether she actually intended
 to cause injury.

 12 A-4795-14T1
 [Id. at 179.]

Accordingly, the Court held that

 a guardian fails to exercise a minimum
 degree of care when he or she is aware of
 the dangers inherent in a situation and
 fails adequately to supervise the child or
 recklessly creates a risk of serious injury
 to that child.

 [Id. at 181.]

 Having reviewed the record, we find no error in the judge's

finding that defendants' admitted use of cocaine and Roxy, on a

daily basis while they were the sole caretakers of their infant

daughter, was grossly negligent or reckless conduct that put

their child in imminent danger of a substantial risk of harm,

thus constituting neglect under the statute. While it is by now

axiomatic that a parent's drug use, without more, will not

establish abuse or neglect, A.L., supra, 213 N.J. at 24, we

agree with Judge Foti that maxim does not insulate these parents

from a neglect finding.

 When our appellate courts have refused to find abuse or

neglect stemming from a parent's drug use, it is because the

Division has failed to establish the extent of the use or its

effect on the parent, thus making it impossible to accurately

assess the risk to the child, see e.g., id. at 27-28; N.J. Div.

of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 470

 13 A-4795-14T1
(App. Div. 2014), or because the child's age or the presence of

other caretakers made clear the parent's drug use posed no

substantial risk to the child, see V.T., supra, 423 N.J. Super.

at 331-32. In such cases, the Court has admonished trial courts

not to fill in the gaps by assuming all parental drug use puts

all children at risk. See A.L., supra, 213 N.J. at 28 ("Judges

at the trial and appellate level cannot fill in missing

information on their own or take judicial notice of harm.").

 We have never held that daily use of opiates and cocaine

while responsible for an infant is not grounds for neglect.

Indeed, we have observed that "[p]arents who use illegal drugs

when caring for an infant expose that baby to many dangers due

to their impaired judgment." N.J. Div. of Child Prot. &

Permanency v. B.O., 438 N.J. Super. 373, 385 (App. Div. 2014).

The trial court did not need to fill any gaps in the proofs

here. Defendants admitted the nature and extent of their daily

drug use, and the physician directing the detox program they

entered voluntarily explained how use at those levels would slow

their reflexes and impair their judgment.2

2
 We reject defendants' argument that the court improperly
admitted the Division's documents because based on hearsay and
Dr. Rambaran's testimony because the Division did not produce a
report containing his opinions prior to the fact-finding
hearing. Judge Foti admitted the Division's screening summary
 (continued)

 14 A-4795-14T1
 Defendants' argument that they only used illegal drugs when

the baby was in the other's care is undercut by Tina's statement

that neither parent was even aware of the extent of the other's

drug use, although both suspected the other was using. A parent

who in order to use illegal drugs, leaves his or her infant in

the care of the other parent, whom the drug abusing parent

suspects is also using drugs, practically defines a failure to

exercise a minimum degree of care. It certainly cannot be

termed a reasonable plan for the safe care of one's eleven-

(continued)
and investigative report pursuant to Rule 5:12-4 and rejected
defendants' objection to Dr. Rambaran's testimony at an N.J.R.E.
104 hearing. As is clear from the court's opinion, the only
statements the judge relied on in the Division's documents and
the Bergen Regional medical records, which were admitted without
objection, were the properly admitted party admissions of
defendants. See N.J.R.E. 803(b) (party admissions) and
803(c)(4) (statements made for purpose of medical diagnosis or
treatment). The Division identified Dr. Rambaran as a witness a
month before the fact-finding hearing and advised defendants it
was seeking a finding pursuant to N.J.S.A. 9:6-8.21, based on
"their use of non-prescription drugs while in a caretaking
role." The doctor was a fact witness having expertise in the
area of drug addiction and treatment. Given the non-technical
nature of the opinions he expressed regarding the impairments
defendants would suffer while under the influence of the
substances they admitted taking, we cannot find the court abused
its discretion in admitting the doctor's testimony
notwithstanding the Division's failure to provide defendants
with a report of his opinions. See Clark v. Fog Contracting
Co., 125 N.J. Super. 159, 162 (App. Div.), certif. denied, 64
N.J. 319 (1973). Given the circumstances, we cannot find
defendants could have been surprised by the doctor's testimony.
See State v. LaBrutto, 114 N.J. 187, 205-06 (1989).

 15 A-4795-14T1
month-old baby. We are satisfied based on the properly admitted

evidence in the record that the trial judge did not abuse her

discretion in finding that defendants' daily use of Roxy and

cocaine for many months prior to the Division's involvement

amounted to neglect of their infant.

 Although not critical to the outcome here, we cannot close

without commenting on the Law Guardian's new position in this

appeal. As we have noted, the Law Guardian, after having urged

the trial judge to find defendants abused and neglected their

infant daughter, abandoned that position and urged us to reverse

the very finding it urged the trial court to make. This was

done without advising us in its brief of the change in position,

much less explaining why it was deemed necessary.

 We addressed the question with the assistant deputy public

defender at oral argument and raised the question of whether we

should not reject the Law Guardian's change of heart as invited

error. See N.J. Div. of Youth & Family Servs. v. M.C. III, 201

N.J. 328, 340 (2010) (explaining that "'[t]he doctrine of

invited error operates to bar a disappointed litigant from

arguing on appeal that an adverse decision below was the product

of error, when that party urged the lower court to adopt the

proposition now alleged to be error'" (quoting Brett v. Great

Am. Recreation, 144 N.J. 479, 503 (1996))). In a letter post-

 16 A-4795-14T1
argument, the Law Guardian contends the doctrine is inapplicable

here because it did not appeal. Although there may well be

sound reasons for not applying the doctrine of invited error

against the Law Guardian given its institutional role in abuse

and neglect matters, the one proffered is likely not among them.3

 We need not decide the issue. We raise it, however,

precisely because of the Law Guardian's important institutional

role in these cases. See N.J.S.A. 9:6-8.23a; In re Maraziti,

233 N.J. Super. 488, 493, 499-500 (App. Div. 1989). We accept

there may be good reason for the Law Guardian to advocate a

different position on appeal than the one it advocated in the

trial court. But we think it plain that the Law Guardian's

institutional role precludes a switch in position because

appellate counsel for the child views the facts differently from

trial counsel in a close case, for example. If there is not

guidance for when a deputy may alter course on appeal, perhaps

there should be. At a minimum, the court should always be

3
 We likewise are not persuaded by the other two reasons
proffered by the Law Guardian, candor to the tribunal and
Administrative Directive #06-12, "Revision to the Appellate
Division's Administrative Protocol for Termination of Parental
Rights Appeals" (July 11, 2012), http://www.judiciary.state.
nj.us/notices/2012/n120725a.pdf, which addresses the briefing
schedule in circumstances where the Law Guardian takes a
position different from the co-respondent. Again, we do not
address these arguments in light of our disposition of the
appeal.

 17 A-4795-14T1
alerted and the Law Guardian's reasons for the change in its

position must be fully briefed.

 Because there is substantial credible evidence in the

record to support the finding of neglect here, we affirm,

substantially for the reasons expressed by Judge Foti in her

clear and concise opinion from the bench on October 31, 2013.

Defendants' and the Law Guardian's remaining arguments, to the

extent we have not addressed them, lack sufficient merit to

warrant discussion in a written opinion. See R. 2:11-

3(e)(1)(E).

 Affirmed.

 18 A-4795-14T1