# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1774-19
A-1857-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

D.H., and T.W.,

     Defendants-Appellants,

and

J.K., Jr., and K.M.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF D.H.,
T.G., and J.W., minors.

_____

> **APPROVED FOR PUBLICATION**
>
> **August 2, 2021**
>
> **APPELLATE DIVISION**

Argued (A-1774-19) March 15, 2021 and
Submitted (A-1857-20) August 2, 2021 – Decided August 2, 2021

Before Judges Sabatino, Gooden Brown, and DeAlmeida.

On appeal from the Superior Court of New Jersey,
Chancery Division, Family Part, Passaic County,
Docket No. FG-16-0048-19.

John A. Albright, Designated Counsel, argued the cause for appellant D.H. (Joseph E. Krakora, Public Defender, attorney; John A. Albright, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant T.W. (Adrienne Kalosieh, Assistant Deputy Public Defender, of counsel and on the briefs).

Patricia O'Dowd, Deputy Attorney General, argued the cause for respondent in A-1774-19 (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Patricia O'Dowd, on the briefs).

Andrew Bruck, Acting Attorney General, attorney for respondent in A-1857-20 (Jane C. Schuster, Acting Assistant Attorney General, of counsel; Patricia O'Dowd, Acting Deputy Attorney General, on the brief).

David B. Valentin, Assistant Deputy Public Defender, argued the cause for minor D.H. in A-1774-19 (Joseph E. Krakora, Public Defender, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, of counsel and on the briefs).

Joseph E. Krakora, Public Defender, attorney for minor D.H. in A-1857-20 (David B. Valentin, Assistant Deputy Public Defender, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

In these related appeals, which we consolidate for purposes of this opinion, two biological parents argue the Family Part wrongfully terminated

their parental rights to their five-year-old son under Title 30 after a guardianship trial. Among other things, they contend the Division of Child Protection and Permanency's ("DCPP's" or the "Division's") testifying expert and the trial judge improperly weighed against them what the parents characterize as their recreational use of marijuana.

To support this argument, the parents refer to the public policies that underlie recently enacted statutes partially decriminalizing non-medicinal marijuana usage in this State. Those statutes implement constitutional provisions adopted by New Jersey voters through a ballot referendum last November. The parents assert that, regardless of whether those new provisions apply retroactively to this case tried in the fall of 2019, the Division failed to meet its burden to establish by clear and convincing proof the four statutory prongs necessary to enable the termination of their rights. Apart from the marijuana issue, the parents contend there are ample other grounds to reverse the Family Part judgment.

We hold that a parent's status as a recreational marijuana user cannot suffice as the sole or primary reason to terminate that parent's rights under Title 30, unless the Division proves with competent, case-specific evidence that the marijuana usage endangers the child or children.

This approach aligns with existing Title 30 case law, the recently adopted constitutional amendment partially decriminalizing non-medicinal marijuana usage, N.J. Const. art. IV, § 7, ¶ 13, and related implementing statutes, as well as child welfare cases from other states. The parties have not presented, and our research has not revealed, any published child welfare case to date in which our courts have strayed from such precepts.

In this case, the parents each admitted they had used marijuana on several occasions while caring for their preschool child, and the Division presented unrebutted expert testimony explaining the risks of harm associated with that conduct. Beyond that, the trial judge had substantial other evidence to further support his finding that all four prongs for termination under N.J.S.A. 30:4C-15.1(a) had been proven by clear and convincing evidence. Hence, the judgment is affirmed.

I.

This case involves the application of familiar standards that govern the termination of a parent's rights and related appellate review. We repeat them here to frame our discussion.

The right "to raise one's children" is fundamental and thus constitutionally protected. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986)

4

(quoting Stanley v. Illinois, 405 U.S. 645, 651 (1972)). Even so, although parental rights are fundamental, they "are not absolute." In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). They are "tempered by the State's parens patriae responsibility to protect the welfare of children," ibid., "when their physical or mental health is jeopardized." A.W., 103 N.J. at 599 (quoting Parham v. J.R., 442 U.S. 584, 603 (1979)).

In New Jersey, "[t]he balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard," which is noted in N.J.S.A. 30:4C-15(c) and elaborated in N.J.S.A. 30:4C-15.1(a). K.H.O., 161 N.J. at 347-48. The four prongs under that standard are:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

5

outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

Those four prongs "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348.

New Jersey law requires the Division to prove each of the four statutory prongs by clear and convincing evidence. A.W., 103 N.J. at 611-12. That burden of proof accords with the Due Process Clause of the Fourteenth Amendment of the United States Constitution, which permits termination of parental rights only upon clear and convincing evidence. A.W., 103 N.J. at 611-12 (citing Santosky v. Kramer, 455 U.S. 745, 753, 768-70 (1982)). Proof by clear and convincing evidence requires the factfinder to have "a firm belief or conviction as to the truth of the allegations sought to be established." Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006) (citation omitted).

"Presumptions of parental unfitness may not be used in proceedings challenging parental rights, and all doubts must be resolved against termination of [such] rights." K.H.O., 161 N.J. at 347 (citations omitted). Termination

should be ordered only when it is "the least harmful or least detrimental alternative." A.W., 103 N.J. at 616 (citation omitted). That said, the court "need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

It is also well established that our appellate review of final judgments of termination in Title 30 cases is circumscribed. In these non-jury matters, "the trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002) (citations omitted). Those findings generally should be upheld so long as they are supported by "adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014).

We give substantial deference to the trial judge's opportunity to have observed the witnesses first-hand and to evaluate their credibility. Ibid. We also bear in mind the considerable expertise of the Family Part, which repeatedly adjudicates cases brought by the Division under Title 9 and Title 30 involving the alleged abuse or neglect of children. See, e.g., N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). Our general deference on appeal is also informed by the Family Part judge's "feel of the case." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008).

A-1774-19

II.

With these general standards in mind, we recite an abbreviated summary of this matter's factual background and procedural history. Although the record is extensive, we need not detail it at length in order to address the salient issues.

Factual Background

These appeals concern a child, D.H. ("Dylan"),[1] who was born in February 2016. Appellant D.H. (the "father" or "David") is the biological father of Dylan, and the child's biological mother is co-appellant T.W. (the "mother" or "Thea"). Thea is also the biological mother of three older children, A.G., T.G., and J.W., who are not the subject of this appeal. J.K., who was named as a co-defendant in this case but did not participate, is the biological father of J.W. The Family Part terminated the rights of all three defendant-parents after the most recent trial, but only David and Thea have appealed.

The Division's involvement with these parents and their respective children stems back to February 2013, when it brought neglect proceedings

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials and pseudonyms to maintain the privacy of the parties. Because the appellant-father's initials (D.H.) are the same as his son's, we refer to appellant as "the father" or "David" and to the son as "Dylan," using for ease of cross-reference the same pseudonyms used in the Division's brief.

A-1774-19

against Thea, who was then living with her two eldest children, her own mother, and two of Thea's siblings.

David and Thea began their relationship by April 2014. At that time, the Division advised David that he could not take part in the care of Thea's children unless he completed a background check that included a substance abuse assessment.

The Division had concerns that David had a history of multiple criminal charges dating back to 2009, which reportedly included robbery and aggravated assault. David provided several initial urine specimens, which tested negative, but an evaluator recommended a more extended drug use assessment. Meanwhile, in September 2015, the Family Part approved a plan of termination of Thea's parental rights to her older children because she had unresolved mental health and substance abuse issues and had been non-compliant with court-ordered services.

Dylan was born in February 2016. Dylan was initially subject to a Dodd removal[2] from the hospital shortly after birth, principally because of concerns about the mother's fitness. The Division immediately filed a neglect action

---

[2] Legislation known as the "Dodd Act" authorizes the emergent removal of children without court order pursuant to N.J.S.A. 9:6-8.29. N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

against the parents seeking the custody, care, and supervision of Dylan. However, Dylan was returned to the parents two days later, under the premise that the father would provide stability and oversight to compensate for the mother's limitations.

From February 2016 through December 2016, Dylan lived with both parents, who were assisted several hours per day by a child aide. The Division removed Dylan in December 2016. The mother had substance abuse and mental health issues throughout 2016 that disqualified her from primary parenting. What changed in December 2016 was that the court learned that the father had started testing positive for marijuana. The court lost confidence in the father's commitment to the conditions on which the court had returned the son after birth, namely, his ability and willingness to supervise the mother's contacts with Dylan to ensure the child's safety.

The Division placed Dylan in December 2016 in the home of a resource mother who also had been caring for his older half-sister. Although the resource mother at one time had expressed a desire to send Dylan elsewhere because he was challenging, she thereafter felt closer to him and now wishes to adopt him. Her bonding evaluation went favorably.

A-1774-19

Meanwhile, during the pendency of this litigation, the parents have had periodic supervised visits with Dylan. They have attended most of the visitation appointments but sometimes came late or cancelled. In one instance, the father was seen getting angry and cursing about how others had cut Dylan's hair, although the rest of the visits were apparently more peaceful.

As noted, the father has a criminal record which is not documented with precision in our record. He acknowledges he served four years in jail on a seven-year sentence.

The father admittedly is a frequent smoker of marijuana. He has received a most-recent DSM-V diagnosis[3] in 2019 of "severe cannabis use disorder," which is unrebutted. He acknowledged, without much specificity, that he smokes marijuana at parties with friends. He also admitted that, on an unspecified number of occasions, he has smoked marijuana with the mother while caring for the children.

---

[3] See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V"), Sections 304.30, 305.20 (enumerating diagnostic criteria for various cannabis use disorders and other characteristics). Among other things, the DSM-V states that "[p]eriodic cannabis use and intoxication can negatively affect behavioral and cognitive functioning and thus interfere with optimal performance at work or school, or place the individual at increased physical risk when performing activities that could be physically hazardous." Id. at 511. In addition, the DSM-V recognizes cannabis use "in the presence of children, can adversely impact family functioning." Ibid.

A-1774-19

The father resists drug testing and drug treatment recommended by the Division. He presented no plan to care for the child on his own without the mother.

As already mentioned, the mother has a long history of mental health and substance abuse issues, as diagnosed by multiple psychiatrists and psychologists. Although she received outpatient substance abuse treatment, she failed to complete it, allegedly due to scheduling problems, and did not continue with at-home treatment after initial attempts. She failed to complete a personality assessment inventory, did not complete several other programs recommended by the Division, and failed to follow through on a number of referrals.

Like the father, the mother has frequently used marijuana for many years. She admitted to the Division's expert, Dr. Mark Singer, that she used marijuana, along with the father, while caring for the children. She acknowledged to Dr. Singer that she was using marijuana on a daily basis until May 2019. She has been administered drug screens periodically, sometimes testing negative but at other times testing positive, including nine dates between January and April 2019. According to Dr. Singer, the mother has used marijuana as a form of self-medication.

12

On the positive side, however, the mother has obtained a high school diploma, has attended trade school, and has become a certified nursing assistant. She has obtained employment and, as of July 2019, was working as a nursing assistant six days a week.

During the parents' bonding evaluation with Dylan, he became aggressive and had difficulty accepting redirection from the mother. By contrast, Dylan did not engage in similar aggressive behavior during his bonding evaluation with the resource mother.

Procedural History

The procedural history of this matter is extensive. The Division initially filed a guardianship complaint in 2015 involving Thea's other children. That initial complaint was dismissed, but then the Division filed a new complaint in February 2017. In August 2017, the Division amended that guardianship complaint to add Dylan and his father David as parties.

The guardianship case has been tried twice. The first trial occurred over two days in February 2018. On March 14, 2018, the Family Part judge who presided over that initial trial (the "first trial judge"), issued a final order dismissing the complaint. The first trial judge found that the Division's proofs, as marshalled at that time, did not suffice to meet the clear and convincing

A-1774-19

standard required for termination. The first trial judge found the Division had not met its burden with respect to the four statutory criteria under Title 30. Among other things, she found the Division had not presented evidence at trial that the father "has ever or will ever use marijuana while caring for [Dylan]." The judge also faulted the Division for not offering sufficient services, and she also found the Division's bonding expert who testified at the first trial (who was not Dr. Singer) lacked credibility. Although she declined to terminate the parents' rights, the first trial judge did continue the Division's care and custody over the children.

The Law Guardian, later joined by the Division, appealed the first trial judge's denial of termination. Applying customary deferential standards of review to the court's fact-finding, we affirmed the first trial judge's decision in an unpublished opinion, N.J. Div. of Child Prot. & Permanency v. T.W., No. A-3437-17 (App. Div. Aug. 16, 2019). Our opinion did not, however, foreclose the Division from pursuing a new guardianship complaint against the parents if new or additional facts were developed. T.W., slip op. at 15.

In March 2019, the Division filed such a new complaint. The complaint alleged, among other things, that Thea had been non-compliant with mental health and substance abuse services, and that David had failed to submit to court-

14

ordered assessments and drug screens. Further extensive evaluations ensued. In addition, the resource mother appeared before the court at a proceeding in April 2019, and expressed her frustrations about Dylan's unresolved status.

The termination case was tried a second time over five intermittent days in the fall of 2019. The case was heard by a different Family Part judge (the "second trial judge"), who had been presiding over several proceedings leading up to the second trial.[4] This time, the Division presented a different expert psychologist, Dr. Singer, who offered testimony about more recent evaluations he had performed of the parents and the resource mother. The Division also presented factual testimony from Philip Bradley, who had taken over as the family's case manager after the first trial, and from an adoption case manager, Pamela Santos, who was assigned to the matter in January 2019. Neither parent testified or presented witnesses and both were absent for all or much of the trial.

On December 12, 2019, the second trial judge issued a final order granting the Division's request to terminate the rights of both parents. On that same date, the second trial judge issued a thirty-five-page written opinion with detailed findings elaborating how the Division had met its burden, by clear and convincing evidence, of all four criteria for termination. As part of the analysis,

---

[4] The first trial judge was by that point in a different judicial assignment.

15

the opinion relied upon the updated evidence presented by the Division, and particularly Dr. Singer's expert testimony.

The judge specifically noted and accepted Dr. Singer's opinion that neither parent is capable of safely caring for the children presently or again in the foreseeable future. The judge found unpersuasive the father's contentions that no safety concerns were noted for Dylan in 2016 because more recent documents "showcase[d]" that as of April 2019, the father "has failed to engage in recommended substance abuse programs, intake sessions, and counseling services." Indeed, the judge noted that "[d]espite the biological parents being involved with the Division, they have failed to meaningfully participate in any services other than visitation." The judge also stressed that the older child, J.W., has been with her own resource parent for four of her six years, and Dylan has been with his caregiver for most of his life. The judge found that "[p]ermanency for the children is paramount to their care."

The present appeals followed.[5] In his briefs on appeal, the father raises the following points:

---

[5] As noted, the Family Part entered its final judgment and opinion terminating the rights of both parents on December 12, 2019. The father filed a timely appeal, extensive initial and supplemental briefing was submitted, and this court heard oral argument on his appeal on March 15, 2021. That same day, the

POINT I

THE LOWER COURT'S PRONG ONE CONCLUSION THAT D.H. HARMED [DYLAN] OR PLACED HIM IN ANY DANGER IS UNSUPPORTED BY THE RECORD AND MUST BE REVERSED, AS DCPP FAILED TO SATISFY THIS STANDARD AT TRIAL IN 2018 AND PRESENTED NO NEW EVIDENCE IN 2019 TO WARRANT OVERTURNING THE FIRST TRIAL JUDGE'S FINDING THAT DCPP NEVER PROVED ANY BASIS FOR REMOVING THE CHILD IN THE FIRST PLACE.

A. NO EVIDENCE ADDUCED AT THE LAST TRIAL REVEALED THE REASON FOR THE REMOVAL OF [DYLAN] FROM D.H. IN THE FIRST PLACE. SINCE THE REMOVAL WAS IMPROVIDENT, SO TOO WAS EVERYTHING THAT FOLLOWED.

---

mother very belatedly—more than one year after the final judgment—moved before this court to file her own appeal as within time, contending she had told her then-attorney in 2019 that she wanted an appeal filed on her behalf if she lost at trial. Although the mother's motion was vigorously opposed by both the Division and the Law Guardian because her appeal would further delay permanency for the minor, we granted the motion on strict conditions. Those conditions included an accelerated briefing schedule, page limitations (with the ability of all counsel to incorporate by reference arguments from the father's appeal), and waiver of further oral argument unless the court deemed it necessary. In addition, we confined the mother's appeal to the minor D.H., denying her request to include other children of hers (J.W. and T.G.) parented by other fathers, one of whom already has been adopted. The reader should not infer from the court's exceptional indulgence of this extremely late appeal, filed long past the forty-five-day deadline of Rule 2:4-1, that it would be equally indulgent in other less compelling circumstances.

A-1774-19

B. THE LOWER COURT'S CONCLUSION THAT D.H.'S "SUBSTANCE ABUSE" HARMED [DYLAN] OR PLACED HIM AT RISK IS UNSUPPORTED BY SINGER'S NET OPINION OR ANY OTHER EVIDENCE IN THE RECORD.

C. THE LOWER COURT'S CONCLUSION THAT D.H. SUFFERED FROM AN UNSPECIFIED "MENTAL HEALTH" ISSUE IS UNSUPPORTED BY SINGER'S NET OPINION OR ANY OTHER EVIDENCE IN THE RECORD.

POINT II

THE LOWER COURT'S CONCLUSION THAT D.H. WAS UNWILLING OR UNABLE TO ELIMINATE THE HARM FACING [DYLAN] IS UNSUPPORTED BY THE RECORD AND MUST BE REVERSED; D.H. SUCCESSFULLY PARENTED HIS SON FOR MOST OF THE FIRST YEAR OF HIS LIFE (2016), AND THERE WAS NO BASIS FOR THE REMOVAL.

POINT III

DCPP'S IMPROVIDENT REMOVAL OF [DYLAN] FROM D.H. WAS PATENTLY UNREASONABLE, AS WERE ALL OF ITS EFFORTS THEREAFTER, WHICH WERE TRANSPARENTLY DESIGNED TO KEEP [DYLAN] FROM HIS PARENTS IN FAVOR OF A FOSTER PARENT WHO ASKED FOR THE CHILD'S REMOVAL AND WENT ON VACATIONS WITHOUT HIM.

A-1774-19

POINT IV

SINCE THE FOSTER PARENT DID NOT TESTIFY AT TRIAL, NO EVIDENCE IN THE RECORD SUPPORTS THE LOWER COURT'S CONCLUSION THAT INDIVIDUAL IS "COMMITTED TO ADOPTION" NECESSITATING REVERSAL OF ITS PRONG FOUR CONCLUSION; THE RECORD CONCLUSIVELY ESTABLISHES THE OPPOSITE OF "COMMITMENT": AS OF MARCH 2019, THE FOSTER PARENT DID NOT WANT [DYLAN].

POINT V

THE LOWER COURT'S EXCLUSION OF AND REFUSAL TO CONSIDER THE RECORD OF THE FIRST TRIAL CONSTITUTED A MANIFEST ABUSE OF DISCRETION AND EXACERBATED AN EGREGIOUS VIOLATION OF THE ONE COURT/ONE FAMILY RULE REQUIRING REVERSAL.

SUPPLEMENTAL POINT I

UNDER N.J. CONST. ART. IV, § VII, ¶ 13, D.H. HAS A CONSTITUTIONAL RIGHT TO RECREATIONAL MARIJUANA USE WHICH MUST APPLY RETROACTIVELY, AND EXERCISE OF THAT RIGHT COULD NOT BE A LEGITIMATE BASIS TO TERMINATE PARENTAL RIGHTS NOW OR THEN.

In her related appeal, the mother joins in the arguments of the father, including the marijuana issue. She also advances the following points:

THE COURT'S HOLDING THAT DCPP MET ITS BURDEN UNDER N.J.S.A. 30:4C-15.1a AND THE

19

JUDGMENT TERMINATING T.W.'S PARENTAL RIGHTS TO [DYLAN] SHOULD BE REVERSED.

POINT I

THE JUDGMENT OF GUARDIANSHIP MUST BE REVERSED AS DCPP'S EVIDENCE DID NOT ESTABLISH PAST MENTAL HEALTH CONDITIONS OR MARIJUANA USE PRESENTED AN ONGOING HARM TO [DYLAN] PURSUANT TO PRONGS ONE AND TWO.

POINT II

THE COURT ERRED IN HOLDING THAT DCPP MET PRONG THREE BECAUSE IT DICTATED T.W.'S "SERVICES" TO HER RATHER THAN PARTNERED WITH HER TOWARD REUNIFICATION.

POINT III

THE COURT ERRED IN FINDING THAT DCPP MET ITS BURDEN AS TO PRONG FOUR BECAUSE THERE WAS NO PARENTAL FAULT IN THE FOSTER HOME'S ASSUMING THE DAILY CARETAKING ROLE.

III.

A.

We begin by briefly addressing the parents' contentions that the second trial should have been assigned to and presided over by the first trial judge, and

20

their related argument that the second trial judge should have afforded deference to the first trial judge's findings. We reject these contentions.

The Rules of Court do not give the parties an enforceable entitlement to have a specific judge preside over a second trial or a related proceeding. To be sure, our Judiciary has observed a general practice, sometimes referred to as "one family/one judge," of endeavoring, where practical, to have one judge assigned to hear related Family Part matters. E.g., Administrative Directive #14-17, "Co-Occurring Child Abuse and Domestic Violence — Operational Guidance" at 4 (June 23, 2017) (presiding judge for a family's children-in-court case should be assigned to new domestic violence case filed for same family "where practical . . . in keeping with the one family/one judge principle"). However, that administrative practice is simply a preference and aspiration, and it does not create any entitlement for litigants.

At times, our appellate courts have directed the assignment of related Family Part cases on remand to the same judge, but without holding that doing so was an absolute requirement. See, e.g., N.J. Div. of Youth & Fam. Servs. v. K.M., 136 N.J. 546, 561 (1994); Div. of Youth & Fam. Servs. v. L.C., 346 N.J. Super. 435, 439-40 (App. Div. 2002); O'Brien v. O'Brien, 259 N.J. Super. 402, 406 (App. Div. 1992); Salch v. Salch, 240 N.J. Super. 441, 444-45 (App. Div.

1990). O'Brien cited a provision that was added to Rule 1:6-2(d) in 1992, namely that "insofar as is practicable," subsequent motions should "be heard by the same judge who heard the first motion in the cause." 259 N.J. Super. at 406. The provision was deleted in 2000 for being "superfluous . . . in view of the single-judge case management required by" Rule 4:5B-1. Pressler & Verniero, Current N.J. Court Rules, History & Analysis of Rule Amendments to R. 1:6-2 (2021) (www.gannlaw.com).

Rule 4:5B-1 states that, "[i]n [civil] Track IV and general equity cases . . . the designated managing judge shall, insofar as is practicable and absent exceptional circumstances, also preside at trial." (Emphasis added). That Part IV provision does not pertain here because this is a Family Part case governed by the special rules for family matters set forth in Part V of the Rules. In any event, Rule 4:5B-1 recognizes, in the language we have underscored, that it may be impractical for a subsequent proceeding to be heard by the same judge who presided over an earlier related proceeding involving the parties. This practical exception to the general preference is vital in enabling the Assignment Judge and Presiding Judges of each vicinage to utilize judicial resources in an optimal manner, and in managing vacancies and case flows among the various dockets. Moreover, the Judiciary has long endeavored, for various beneficial reasons, to

rotate most Superior Court judges among various docket assignments during their years of service in the trial court. Here, the first trial judge was no longer assigned to the Children in Court docket in the vicinage when the second trial occurred.

In addition, we reject the parents' claims that the second trial judge was unfairly inattentive to the findings of the first trial judge. Although the second trial judge declined to admit into evidence the first trial judge's transcribed oral opinion, he was clearly aware of his predecessor's findings. The second trial judge permitted the parties to admit exhibits that had earlier been presented at the first trial, and the parties point to no actual evidence from the first trial that was unfairly excluded at the second trial.

We are keenly aware that the second trial judge reached a different conclusion about termination than the first trial judge. But the second trial judge was provided with additional and different evidence that had been developed in the twenty-month interval between the trials. The second judge was in no way bound to reach the same decision as his predecessor, and his contrary outcome reflects no lack of respect or due deference.

A-1774-19

B.

In his initial brief on appeal, the father argued the trial court erred in relying on testimony of the Division's expert, Dr. Singer, criticizing his use of marijuana. In particular, the father challenged Dr. Singer's opinion that he was not a "viable parent" because of his "ongoing issue of substance abuse . . . using unprescribed marijuana, [and] using a mind-altering substance while caring for a child." The father argued Dr. Singer "failed to provide any explanation as to how [his] purported marijuana use precluded him from viable parenting, [given that] he had been ruled out for substance abuse in January of 2016, following an 'extended' substance abuse assessment."

Continuing with this theme, the father argued, as a matter of policy, that recreational marijuana use should not disqualify a person from serving as a parent. As the father asserted, if such a policy of disqualification were adopted and followed, "the child welfare apparatus of those states that permit such use would be quickly overrun." His brief then listed ten states in which both recreational and medical marijuana use is legal, and twenty states, including New Jersey, that have authorized the use of marijuana for medical purposes, subject to certain terms and conditions. The father emphasized this point again in his reply brief, arguing that Dr. Singer's "net opinions" reflected "untested

presumptions" about marijuana usage that the Division failed to show were based on a scientifically reliable methodology shared by others in the field.

After the merits briefs on appeal were filed, the legal landscape in New Jersey concerning recreational marijuana changed. In the general election held on November 3, 2020, the voters adopted a constitutional amendment effective as of January 1, 2021, that legalized the possession, consumption, and commercialization of cannabis and products containing it by persons twenty-one years of age or older, but potentially "subject to regulation by the Cannabis Regulatory Commission." N.J. Const. art. IV, § 7, ¶ 13 (the "amendment"). The amendment reads as follows:

> The growth, cultivation, processing, manufacturing, preparing, packaging, transferring, and retail purchasing and consumption of cannabis, or products created from or which include cannabis, by persons 21 years of age or older, and not by persons under 21 years of age, shall be lawful and subject to regulation by the Cannabis Regulatory Commission created by P.L.2019, c.153 (C.24:6I-5.1 et al.), or any successor to that commission.
>
> [Ibid.]

The amendment did not apply to cannabis and products containing it that are "dispensed and consumed for medical purposes pursuant to any law enacted by

the Legislature" and regulated thereunder, or to hemp or hemp products subject to regulations adopted pursuant to other legislation. Ibid.

Statutory changes soon followed. On February 22, 2021, the Legislature enacted three bills to establish a broad regime of civil and criminal provisions to regulate the newly legalized activity and achieve the constitutional amendment's public policy goals. Those enacted bills are the "New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act," L. 2021, c. 16 (enacting A. 21 (2020)) (codified in relevant part at N.J.S.A. 2C:35-5 to -10 and N.J.S.A. 24:6I-24) (the "first enactment"); the act "concerning certain criminal and civil justice reforms," L. 2021, c. 19 (enacting A. 1897 (2020)) (the "second enactment"); and the act "addressing certain regulated substances, with a particular emphasis on possession or consumption of various forms of cannabis." L. 2021, c. 25 (enacting A. 5342 (2021)) (the "third enactment").

One new set of provisions relevant to this discussion, in section 47 of the first enactment, was apparently only included in A. 21 and never in any version of the other bills. Those provisions in section 47 declare that positive screening test results for marijuana use may not be "the sole or primary basis" for Division

26                                                                                    A-1774-19

action, but the Division may act "based on harm or risk of harm to a child," and it is free to cite evidence of positive test results:

> The <u>presence of cannabinoid metabolites in the bodily fluids of a person</u> engaged in conduct [that is not prohibited by this enactment]:
> . . . .
>
> (3) with respect to a parent or legal guardian of a child or newborn infant, or a pregnant woman, <u>shall not form the sole or primary basis for any action or proceeding by the Division of Child Protection and Permanency</u>, or any successor agencies; <u>provided, however, that nothing in this paragraph shall preclude any action or proceeding by the [D]ivision based on harm or risk of harm to a child</u> or the use of information on the presence of cannabinoid metabolites in the bodily fluids of any person in any action or proceeding.
>
> [<u>L.</u> 2021, <u>c.</u> 16, § 47(b)(3) (emphasis added) (amending N.J.S.A. 2C:35-10(a)(3)(b)(ii)).]

Section 47 is to "take effect immediately, but shall only become operative upon adoption of the [Cannabis Regulatory C]ommission's initial rules and regulations." <u>L.</u> 2021, <u>c.</u> 16, § 87(a)(2). The Commission was established in 2019 as part of other marijuana-related legislation and its members appointed in November 2020. The first enactment retains the existing statutory specification of the expertise that the five members of the Commission must have. <u>L.</u> 2021,

c. 16, § 5 (amending N.J.S.A. 24:6I-24(b)(4) (originally enacted in L. 2019, c. 153, § 31)). The Commission's membership does not expressly need to include expertise in child welfare.

Other new provisions relevant to this discussion, i.e., changes to N.J.S.A. 2C:35-5, were enacted both as section 55 of L. 2021, c. 16, and as the new section 1 of L. 2021, c. 19.[6] The relevant language in those sections is identical.

More important here is an amendment to N.J.S.A. 2C:35-5(b), declaring that parental rights, and the right to assistance in support of keeping families together, shall not be infringed "solely by reason of committing" a first or subsequent offense of possessing one ounce or less of marijuana with prohibited intent:

> A person shall not be deprived of any legal or civil right, privilege, benefit, or opportunity provided pursuant to any law solely by reason of committing a violation of subparagraph (b) of paragraph (12) of this subsection [i.e., possession of one ounce or less of marijuana], nor shall committing one or more violations modify any legal or civil right, privilege, benefit, or opportunity provided pursuant to any law, including, but not limited to, the granting, renewal, forfeiture, or denial of a license, permit, or certification, qualification for and the receipt, alteration, continuation, or denial of any form of financial assistance, housing assistance, or other social

---

[6] They were also in the former "section 3" that was deleted from the final version of A. 5342.

services, rights of or custody by a biological parent, or adoptive or foster parent, or other legal guardian of a child or newborn infant, or pregnant woman, in any action or proceeding by the Division of Child Protection and Permanency . . . .

[L. 2021, c. 16, § 55 (amending N.J.S.A. 2C:35-5(b)(12)(b)(ii)) (emphasis added).]

In light of these developments, we requested counsel to provide us with supplemental briefs addressing their potential impact upon this case. The father argues the constitutional amendment established a right to recreational use of marijuana without legal repercussions, that it therefore bars any consideration of parental recreational use in a termination case, and that the high degree of constitutional protection afforded to parental rights compels retroactive application of this ameliorative provision. He argues further that the amendment is a repudiation of outdated prejudices about the abilities and intentions of recreational marijuana users, including presumptions of parental unfitness, even when an expert insists that they remain valid. The mother has incorporated these and other related arguments by the father into her own position.

The Division, meanwhile, submits that the amendment and the related legislation merely validate a standard that it followed in this case, which was to act not solely on the fact that the parent used marijuana or some other intoxicant, but rather to act when the use created an unsafe environment for the child. The

29

Division argues the trial court did not err in accepting Dr. Singer's expert testimony, and in relying upon his opinion that the parents' admitted marijuana usage—particularly while caring for children—posed a risk of harm that bears upon the termination analysis. The Division further questions whether the new provisions should apply retroactively to this matter that was tried in the fall of 2019 before their enactment.

The Law Guardian argues the constitutional amendment and implementing legislation mainly target the social injustice of the disparate punishment of racial minorities for marijuana possession, and the resulting social and economic inequities, by easing an excessive punishment regime. The Law Guardian contends the new provisions do not fundamentally alter the child welfare laws under which the Division provides protection and promotes family rehabilitation. As asserted by the Law Guardian, our child welfare system already strives to avoid disparities by acting only when there is a risk of harm to the child, rather than on the basis of parental intoxicant use with nothing more. It contends that here Dr. Singer established such risks of harm by explaining how the parents' marijuana use imperiled Dylan.

Having considered these points, we conclude that we need not resolve in this appeal issues of statutory retroactivity, because our case law under Title 30

has heretofore not applied a "per se" approach deeming a parent unfit just because that parent has used unprescribed marijuana. For example, in N.J. Division of Youth & Family Services v. A.L., 213 N.J. 1, 22 (2013), our Supreme Court instructed that the focus of child welfare cases must be on the impact of a parent's substance abuse on the child, and whether that use precludes safe parenting. "[N]ot all instances of drug ingestion by a parent will substantiate a finding of abuse or neglect." N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 332 (App. Div. 2011); see also N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 145-47 (App. Div. 2016) (remanding a Title 30 termination case for additional testimony to develop more clearly whether the parent's marijuana use and her boyfriend's drug dealing occurring within the home could have been harmful to the children).

In this regard, our case law has recognized that the age of the child may bear upon the risks posed by the parent's drug usage. Compare N.J. Div. of Child Prot. & Permanency v. B.O., 438 N.J. Super. 373, 385 (App. Div. 2014) (observing that parents who use drugs while caring for an infant can expose that child to many dangers due to their impaired judgment), with V.T., 423 N.J. Super. at 331 (noting that an eleven-year-old child, unlike an infant, was not

vulnerable "to the slightest parental misstep" when visiting, in a Division-supervised setting, her father, who tested positive for drugs).

Moreover, as the Law Guardian has submitted, smoked marijuana has not generally been consumed in standardized doses, and the THC and cannabinoid content of marijuana may depend on growing conditions and plant genetics. David Malleis, Note and Comment, The High Price of Parenting High: Medical Marijuana and Its Effects on Child Custody Matters, 33 Univ. La Verne L. Rev. 357, 379 (2012). Further, the actual amount of THC absorbed into the body can vary greatly among different people. Ibid.

Our point is that, even as of the time the second trial occurred in late 2019 before the 2020 constitutional amendment and the 2021 implementing legislation, the case law in our State has not historically treated a parent's usage of marijuana, whether illegal or not, as a categorical basis for stripping that defendant of his or her parental rights. Instead, we have looked to the case-specific impacts the drug usage has or has not had on the child's care and safety. That same contextual approach is embodied in the new statutory language.

By analogy, just because the Twenty-First Amendment of the United States Constitution ended Prohibition, that does not entitle a parent to imbibe alcoholic beverages in a manner that endangers children under that parent's care.

A-1774-19

See, e.g., N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281-85 (2007) (recognizing that an otherwise-fit parent's refusal to separate from an alcohol-addicted mother posed sufficient harm to the child to satisfy the first two prongs of the termination criteria).

The experience in other states is consistent with this non-categorical approach. Some states have legislated express provisions dealing with a parent's legal recreational or medical marijuana use. Such codes generally provide that parental rights may not be denied solely on the ground of legal marijuana use, because harm or a risk of harm must be proved, and marijuana use by itself does not support a presumption of neglect or endangerment. E.g., Ariz. Rev. Stat. Ann. § 36-2813(D) (2021) (medical); Del. Code Ann. tit. 16, § 4905A(b) (2021) (medical); 410 Ill. Comp. Stat. Ann. 130/40(b) (2021) (medical) and 410 Ill. Comp. Stat. Ann. 705/10-30 (recreational); Me. Rev. Stat. Ann. tit. 22, § 2430-C(4) (2020) (medical); Mich. Comp. Laws Ann. § 333.27955(3) (2021) (recreational); Minn. Stat. Ann. § 152.32(3)(e) (2021) (medical); N.H. Rev. Stat. Ann. § 126-X:2(VI) (2020) (medical); Wash. Rev. Code Ann. § 69.51A.120 (2021) (medical). In states without such a statutory provision, some courts nonetheless have applied a similar distinction and found, in certain child welfare cases, that a risk of harm from the parent's marijuana use had not been shown.

E.g., In re T.B., 529 S.E.2d 620, 625-26 (Ga. Ct. App. 2000); C.M. v. Ind. Dep't of Child Servs., 130 N.E.3d 1149, 1157 (Ind. Ct. App. 2019); In re M.S., 889 N.W.2d 675, 682-84 (Iowa Ct. App. 2016); In re K.M.A.-B., 493 S.W.3d 457, 469-71 (Mo. Ct. App. 2016); In re ATE, 222 P.3d 142, 147-48 (Wyo. 2009).

In keeping with these principles and consistent with the soon-to-be-effective new laws, we hold that a parent's recreational marijuana use cannot be the sole or principal basis for terminating that person's parental rights. Instead, the Division must demonstrate, by the clear and convincing evidence required under Title 30, that the parent's usage poses a risk of harm to the child or children to a degree that satisfies the first and second prongs of the termination criteria. The new statutory provisions codify and reinforce these long-recognized principles.

With respect to appellants' contentions about expert methodology, we recognize that our evidence rules in civil matters are now guided by the reinforced gatekeeping requirements of In re Accutane, 234 N.J. 340 (2018). See also N.J.R.E. 702. Even so, we are not persuaded that Dr. Singer in this case lacked the credentials to provide the opinions he offered, or that his methodology was manifestly unreliable. Defense counsel did not object to Dr. Singer's qualifications and the trial judge deemed his testimony to be reliable.

A-1774-19

We likewise do not repudiate the trial court's consideration of the report of the substance abuse evaluator who diagnosed the father in 2019 with severe cannabis use disorder under the DSM-V criteria. The bases for the expert assessments were reasonably explained and were not inadmissible "net opinions." Townsend v. Pierre, 221 N.J. 36, 55 (2015). That said, we would anticipate that in future guardianship cases, the Division and the other parties will present more fulsome expert proof of the presence or absence of risks of harm of the parent's marijuana usage,[7] now guided by the explicit terms of the new statutes.

C.

On the record presented, we are satisfied the trial court had substantial credible evidence to conclude that the Division established all four prongs of the termination criteria, and that the court did not apply an impermissible per se approach disqualifying them as caretakers because of their marijuana usage. Both parents admitted during their interviews that they had smoked marijuana on multiple occasions while the children were in their care.

---

[7] Without mandating it, we would expect that the judges trying these cases in the future would benefit from hearing testimony from expert witnesses who have particular specialization in marijuana use and dependency.

We recognize the record does not show that Dylan or the other children were injured in an accident, or abandoned in an unsafe place, or that some other mishap occurred while one or both parents were in a marijuana-induced impaired state of mind. However, it is well established in Title 30 cases that actual harm to children need not occur and that the prospective risks of harm may suffice. The court need not "wait to act until a child is actually irremediably impaired." In re Guardianship of D.M.H., 161 N.J. at 383.

Furthermore, the expert opinions of Dr. Singer and the substance abuse evaluator who diagnosed the father were not rebutted by any competing expert proof. This is not a case involving casual or occasional marijuana usage, but instead one in which the father has been diagnosed with a severe addiction, and the mother likewise has had a long, documented history of substance abuse, coupled with her own persisting mental health issues.

Beyond this, there are ample additional grounds identified in the second trial judge's detailed opinion, well beyond the parents' admitted marijuana usage, that support the court's decision to terminate. Among other things, those factors included the mother's mental health problems, the parents' repeated failures to complete certain services reasonably offered by the Division, their inconsistent attendance at visitations, and their difficulties with housing despite

36                                                                        A-1774-19

financial assistance. The trial court did acknowledge the parents' temporary period of custody in 2016 during Dylan's first year before he was justifiably removed a second time, as well as the mother's subsequent success in becoming educated and employed. The court reasonably weighed those and other considerations, including Dylan's strong bonds with his resource mother, and Dr. Singer's unrebutted expert analysis of why termination of the parents' rights would not cause Dylan more harm than good.

In sum, applying the deference we must afford to the Family Part judge as the fact-finder, we affirm the court's final judgment, substantially for the cogent reasons detailed in the judge's written opinion.

We have duly considered all of the other points raised by appellants in seeking to overturn the judge's decision, and conclude none of them have sufficient merit to warrant comment. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1774-19