# (RECORD IMPOUNDED)

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3951-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

R.H.,

      Defendant,

and

R.H.,

      Defendant-Appellant,

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.H.,
a minor.

_____

      Submitted April 1, 2025 – Decided April 25, 2025

      Before Judges Smith and Chase.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0014-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Amy M. Williams, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Juliana L. Stiles, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor L.H. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant R.H. (Richard) appeals from the Family Part's July 26, 2024 order terminating his parental rights over L.H. (Laura) following a one-day trial.[1] Richard argues that: the trial court's four-part analysis under N.J.S.A. 30:4C-15.1(a) was erroneous; that he was denied due process based on insufficient notice of the termination proceedings; that plaintiff, the New Jersey Division of Child Protection and Permanency (DCPP), relied primarily on

---

[1] We use initials and pseudonyms to identify the parties, the children, and others to protect the privacy of children, and because records relating to Division proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

hearsay evidence and unreliable records; and that DCPP's failure to present Laura's grandmother as a witness at trial denied him due process. We affirm.

I.

Laura was born to R.H. (Rita) in December 2022. At the time of birth, both Rita and Laura tested positive for cocaine. Rita informed a social worker at the hospital that she was homeless, she had been diagnosed with depression and anxiety, she had a criminal history, and her current partner, Richard, provided her drugs, used drugs himself, and was emotionally and verbally abusing her. Based on this information, the social worker sent a referral to DCPP regarding Laura. Rita identified Richard as Laura's putative father, but he was not named on Laura's birth certificate.

Upon Laura's discharge from the hospital on December 23, DCPP conducted an emergency removal, or DODD removal, of Laura from Rita and Richard's care and placed her in the care of her maternal grandmother. DCPP determined that a safety protection plan with either parent in Richard's home would not be appropriate. Both Rita and Richard signed the DODD removal order and were informed where Laura would be staying and of a court hearing set for December 28. Other than Laura's maternal grandmother, neither Rita nor Richard provided alternative options for Laura's placement.

## A.

Both Rita and Richard attended the December 28 hearing. After the hearing, the Family Part entered an order to show cause in the FN docket placing Laura in DCPP's custody. The order permitted both Rita and Richard to visit Laura three times a week for up to two hours. The order also required both Rita and Richard to complete a substance abuse evaluation, a psychological evaluation, and random urine and hair follicle drug screens.

On December 29, Richard told DCPP that, given Rita's involvement with another man, he wanted to take a paternity test to verify that he was Laura's biological father. Richard stated that he would not comply with services until a paternity test was completed.

After a January 17, 2023 hearing attended by Rita, but not Richard, the trial court entered a child protection multipurpose order regarding the return on the order to show cause. The order continued DCPP's custody over Laura and Rita's visitation rights but no longer permitted Richard's visitation rights. In lieu of complying with the prior requirements of the order to show cause, Richard was ordered to complete a paternity test. A paternity test was scheduled for February 17. Richard failed to attend the paternity test.

4

The court held a case management review hearing on March 1, 2023. The trial court required both Rita and Richard to attend a psychological evaluation and a substance abuse evaluation or treatment, as well as submit to random drug and alcohol screenings. Richard's parenting time rights with Laura were made contingent on him completing a paternity test.

The DCPP contacted Richard to schedule another paternity test, which was set for April 19. On April 13, the trial court conducted a fact-finding hearing regarding Rita's abuse or neglect of Laura. The trial court issued a final disposition on April 13, which maintained DCPP's custody over Laura and Rita's visitation rights. The court made no findings as to Richard's conduct because no claims of abuse or neglect were made against him. The trial court also deferred Richard's requirements to complete a substance abuse evaluation and psychological evaluation until he completed his April 19 paternity test. Richard failed to attend this paternity test, and when DCPP attempted to contact him, it received a message that his phone was not working.

On July 5, the trial court issued an order related to a compliance review, which maintained DCPP's custody over Laura. The order required Rita and Richard to attend a psychological evaluation and a substance abuse evaluation, as well as submit to random drug testing. The order granted Richard visitation

rights, which had initially been revoked on January 17, and required him to take a paternity test.

Having been unable to locate Richard, DCPP conducted an inquiry into Richard's whereabouts by sending letters to numerous entities[2] on August 7. DCPP also conducted searches on the various websites. These searches were memorialized in an affidavit of inquiry submitted on September 25. DCPP never located Richard.

On September 8, DCPP received a text message from Rita that she had moved into a motel. Rita had acquired the motel placement through social services. When DCPP conducted an unannounced visit to the motel on October 16, both Rita and Richard were there. Richard declined to complete a paternity test when asked.

---

[2] The Burlington Postmaster; the Camden Police Department, Records Department; Camden County Jail, Records Department; the State of New Jersey Department of Labor and Workforce Development; Parent Locator Services, New Jersey State Office of Child Support Services, Department of Human Services, Division of Family Development; the Department of Corrections, Bureau of Parole; the Burlington County Department of Corrections Records Department; the Burlington County Prosecutor's Office; the Burlington County Board of Social Services, Burlington County Human Services Facility; the Central Reception and Assignment Facility Classification Department; the New Jersey Division of elections; the Atlantic County Department of Corrections; and the Burlington County Probation office.

A-3951-23

At a summary finding hearing conducted on October 10, the trial court found that Rita and Richard "are part of a family in need of services. Those services are to include a psychological evaluation and any recommended services, a substance abuse evaluation and any recommended services, random drug screening including a hair follicle test, paternity testing, and supervised visitation." In its order, the court did not alter Rita's or Richard's visitation rights, or the requirements placed on Rita or Richard from the July 5 order.

The court issued a disposition order on December 6. In its order, the court did not alter Rita's or Richard's visitation rights, or the requirements placed on Rita or Richard from the July 5 order. The court also issued a permanency order finding that DCPP made reasonable efforts to finalize the permanent plan, including "[s]ubstance abuse services, mental health services, random drug screening, visitation, paternity testing, searches for the parents, assessment of relatives, and monthly visits to the relative resource home to ensure all of [Laura's] needs are being met." The court determined that the termination of parental rights followed by adoption was the appropriate plan, because "[n]either parent has meaningfully engaged in any services or visitation to work towards reunification with [Laura]. [Laura] is placed with a relative who wishes to adopt and is able to maintain the family connection for [Laura]."

A-3951-23

DCPP scheduled a paternity test for Richard on February 12. DCPP attempted to contact Richard to discuss paternity testing on January 17, 2024, but a message indicated that Richard's phone had "calling restrictions" that prevented DCPP from completing the call.

B.

On January 23, 2024, DCPP filed a guardianship complaint in the FG docket seeking to terminate Rita and Richard's parental rights. Richard was served with DCPP complaint on January 29 at the motel where he and Rita were staying. While being served, Richard completed a 5A form[3] requesting counsel during the termination proceedings.

On January 25, DCPP informed Rita and Richard by text message of Richard's February 12 paternity test.

On February 9, 2024, the trial court heard argument on the order to show cause to terminate Rita and Richard's parental rights. Appointed counsel for Rita and Richard were present, although neither parent was present. All parties

---

[3]  "On [the 5A form], 'the defendant provides employment and financial information and indicates whether he or she requests representation by' the [Office of the Public Defender]." State v. A.L., 440 N.J. Super. 400, 404 (App. Div. 2015) (quoting In re Custodian of Records, Criminal Division Manager, 214 N.J. 147, 160 (2013)).

A-3951-23

agreed to dismiss the FN docket litigation and to proceed under the FG docket. At the time of the hearing, Richard had not performed a paternity test. The court ordered both parents to attend psychological and bonding evaluations and submit to random urine screens and hair follicle testing. The court permitted weekly supervised visitation between Laura, Rita, and Richard. The court also ordered Richard to complete paternity testing. Finally, the court scheduled: a case management review on April 4; a mediation on May 15; a pre-trial conference on July 10; and a trial on July 17 and July 18.

When Richard did not attend his February 12 paternity test, DCPP rescheduled the test for February 27. After verifying Richard's new phone number with Rita, DCPP attempted to call Richard, who did not answer. Richard did not attend the February 27 paternity test.

Jenna Scott, a newly assigned DCPP case worker, informed both parties of a case management conference set for April 5 by email. Scott indicated that the order she emailed to the parents had April 4 as the case management conference date, not April 5. Neither party replied to Scott's email. Scott attended court on April 4 for an hour, but neither parent attended.

On April 5, 2024, the trial court conducted the case management conference. Richard did not attend, but Richard's counsel was present.

A-3951-23

Richard's counsel left a voice message to Richard about the case management hearing through the phone number provided on Richard's 5A form, which happened to be his mother's phone number. DCPP indicated that it had Richard's email, but that the phone number provided was out of service and the only other means of contacting Richard was through his mother's phone.

At the May 15, 2024 mediation, Rita executed an identified surrender of her parental rights to Laura to allow Laura's grandmother to adopt her. Richard did not attend the mediation.

Scott spoke with Richard by phone on June 17 to inform him of the following scheduled events: a psychological evaluation on July 2; a pre-trial conference on July 10; and trial dates for the termination of his parental rights on July 17 and July 18. When asked whether he would attend these dates or an unscheduled paternity test, Richard stated that he had avoided going to various places due to active warrants against him.[4] Scott encouraged Richard to speak with his attorney.[5] At the time of the call, Richard had been living in the backyard of his mother's home.

---

[4] Scott stated at trial that she was unable to identify any active warrants against Richard subsequent to their conversation.

[5] On July 1, Scott left a card for the Office of Parental Representation at Richard's mother's home.

A-3951-23

After their conversation, Scott sent a letter to Richard by regular and certified mail informing him of his psychological evaluation, pre-trial conference, and trial dates. On June 18, Scott sent a letter to Richard informing him of a paternity test that was scheduled for July 1.

Scott went to Richard's residence on July 1 and July 2 to transport him to his paternity test and psychological evaluation, respectively, but neither he nor his mother were there at either time. Richard did not attend either appointment.

On July 10, a pre-trial conference was held. Richard did not attend, but his counsel was present. The parties agreed that the trial should be reduced from two days to one, and an updated court order was issued setting July 17 as the trial date. Richard's counsel did not object to DCPP's intended list of exhibits. The court ordered Richard to complete a paternity test and to comply with psychological and substance abuse evaluations before the trial.

On July 12, Scott went to Richard's residence to deliver the updated court order, but no one was there. Scott left the court order in the mailbox. Finally, Scott attempted to contact Richard on July 16 to remind him of the July 17 trial. Scott spoke with Richard's mother and told her of the date and time of the trial.

The parental termination trial commenced on July 17. Richard did not appear but was represented by counsel. At trial, DCPP offered Scott as their

witness. DCPP was the only party to have a witness testify or offer exhibits into the record. Richard's counsel did not object to the exhibits or to Scott's testimony.

## C.

On July 18, the trial court issued its order making credibility findings, as well as findings of fact and law. The court evaluated the four-pronged-best-interest test outlined in N.J.S.A. 30:4c-15.1(a) and determined that DCPP had met its burden for each element by clear and convincing evidence.

For the first prong,[6] the court found:

> there has been harm to [Laura] because [of] the parental relationship with [Richard]. [Richard's] inaction has been a harm to [Laura]. Although he was offered visitation each week since birth, there have been no visitations with [Laura] and in fact, he has never even met [Laura]. He has essentially abandoned her care to others. [Richard] had domestic violence issues with [Rita] that could harm [Laura]. And he has substance abuse issues that could harm [Laura], including his supplying drugs to [Rita] while she was pregnant and selling drugs out of his home. Therefore, [Laura's] health, safety, and development has been and will continue to be harmed by the parental relationship with [Richard].

---

[6] "The child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4c-15.1(a)(1).

As for the second prong,[7] the court found:

> [Richard] has chosen to never take part in any services provided by the [DCPP] and has never even met [Laura]. He has taken zero steps in order to remediate the issues that the [DCPP] had including substance abuse, domestic violence, and housing issues. Further, any delay in permanency would only add to the harm already experienced by [Laura]. [Richard] has had a total of over one and a half years to attempt remediation of his issues. Yet, he has not even taken the step to have a paternity test which has been offered to him over six times. [Laura] should not have to wait even one more day for the permanency she deserves. This is the only home she has ever known.

The court then analyzed the third prong of the best interest test in two parts. In evaluating whether DCPP "made reasonable efforts to provide services to help [Richard] correct the circumstances which led to [Laura's] placement outside the home[,]"[8] the trial court found that

> the [DCPP] has offered services to [Richard]. This includes visitations, potential evaluations, potential drug screenings, and counseling. But [Richard] has not taken part in any of those. There was testimony that he stated he would not engage in any services until paternity was proven, but then he failed to attend any one of the six paternity tests that were scheduled for him.

---

[7] "The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm[.]" N.J.S.A. 30:4c-15.1(a)(2).
[8] N.J.S.A. 30:4C-15.1(a)(3).

The court then determined that it had considered alternatives to terminating Richard's parental rights:

> Here, the [DCPP] assessed multiple other potential placements[,] but they were all ruled out or basically chose to leave [Laura] with her maternal grandmother. There were discussions regarding kinship legal guardianship versus adoption, which took place between the maternal grandmother and the [DCPP] on February 7, 2023, February 22, 2023, May 17, 2023, July 20, 2023, November 9, 2023, and March -- and in March 2024. The maternal grandmother stated that she was not willing to do a kinship legal guardianship and that she wanted adoption and still does. Her desires for adoption are certainly reasonable in that [Richard] has never taken any of the six paternity tests offered to him, nor has he taken any steps to even meet or visit with [Laura] in her one and a half years since her birth.

Finally, the trial court found that termination of Richard's parental rights would not do more harm than good.[9]

> [Richard] has never had a parental relationship with [Laura]. He has never met [Laura] despite being named her father since her birth in December of 2022. No harm could come from terminating [Richard's] parental rights for this reason. In fact, it would cause far more harm to [Laura] if she was separated from her resource parent, as the resource parent is the only home she's ever known. And it is a safe and thriving home. Uniting [Laura] with [Richard] for the first time, since they've never even met, would only cause more harm than good. [Richard] has not taken even one positive step toward reunification with [Laura] in the past one

---

[9] N.J.S.A. 30:4C-15.1(a)(4).

and a half years since her birth, as he did not even show up for any of the six paternity tests scheduled for him, nor did he ever make one attempt to even meet her ever.

In an order issued on July 26, the trial court terminated Richard's parental rights, as well as "the father, whomsoever he may be."

On appeal, Richard argues that the trial court erred by findings that DCPP met its burden to show by clear and convincing evidence that all four prongs of N.J.S.A. 30:4C-15.1(a) were met. Richard also contends that he was not afforded due process.

## II.

### A.

Our standard of review is well-settled. In Title 30 cases, we will not second-guess or substitute our judgment for that of the Family Part, provided its factual findings are "grounded in substantial and credible evidence in the record." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "We accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and

because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

We owe no deference to a judge's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency A.B., 231 N.J. 354, 369 (2017).

B.

In considering whether to terminate parental rights, the trial court applies a best interests test, contained in N.J.S.A. 30:4C-15.1(a), which requires consideration of these four "prongs":

> (1) [t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) [t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) [t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

16

(4) [t]ermination of parental rights will not do more harm than good.

DCPP must prove each prong by "clear and convincing evidence." N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 115 (App. Div. 2021). These prongs "are not discrete and separate;" they overlap to inform a more general inquiry that the termination of parental rights is in a child's best interests. N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018). "'The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent.'" N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 249 (App. Div. 2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)). "'[P]arental fitness is the key to determining the best interests of the child.'" N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 170 (2010) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously

17

endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. In guardianship and adoption cases, such as here, it is well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

## III.

### A.

As a threshold matter, we first consider Richard's due process claim. Richard argues that the pace of the termination proceedings, the introduction of hearsay evidence, the unreliability of DCPP records, and DCPP's failure to have Laura's grandmother testify at trial deprived him of his due process rights.

Because defendant's arguments were not raised below, we are not required to consider them. See Azzaro v. Bd. of Educ., 477 N.J. Super. 427, 435 n.2 (App. Div. 2023) (citing Selective Ins. Co. of Am. v. Rothman, 208 N.J. 580, 586 (2012)). For completeness, we address the points here, therefore we apply

a plain error standard of review. See R. 2:10-2; Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 128 (2008) (citing Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 493 (2001)). "The mere possibility of error is insufficient for reversal. We must determine whether, in the interests of justice, the cited error had the 'clear capacity for producing an unjust result.'" N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 622 (App. Div. 2010) (quoting Tartaglia, 197 N.J. at 128) (internal quotation marks omitted).

Richard contends that: the termination proceedings lasted six months, and during that period "the entirety of the [DCPP's] involvement with [Richard] was one in-person visit to effect service of the [g]uardianship [c]omplaint, one text, one telephone conversation, one voicemail message, and several pieces of mailed correspondence or documents left at [his mother's address], with no proof of receipt by [Richard]." He submits that DCPP's activity over the six-month period was simply not enough to comport with his due process rights.

Due process generally "requires adequate notice and a fair opportunity to be heard." N.J. Div. of Child Prot. & Permanency v. K.S., 445 N.J. Super. 384, 390 (App. Div. 2016) (quoting Div. of Youth & Fam. Servs. v. M.Y.J.P., 360 N.J. Super. 426, 464 (App. Div. 2003)). "The doctrine of fundamental fairness 'serves to protect citizens generally against unjust and arbitrary governmental

19

action, and specifically against governmental procedures that tend to operate arbitrarily.'" State v. Saavedra, 222 N.J. 39, 67 (2015) (emphasis omitted) (quoting Doe v. Poritz, 142 N.J. 1, 108 (1995)). Courts view the doctrine as part of due process. Ibid. "The doctrine is applied 'sparingly' and only where the 'interests involved are especially compelling'; if a [party] would be subject 'to oppression, harassment, or egregious deprivation,' it is to be applied." Ibid. (quoting Doe, 142 N.J. at 108).

In its oral statement of reasons, the court found Richard received sufficient notice of the termination proceedings. This finding was supported by ample credible evidence in the record.

DCPP informed Richard on January 29, 2024, that it sought to terminate his parental rights. Richard's counsel was present at all the hearings that occurred throughout the termination proceedings. Richard's counsel had difficulty contacting Richard by phone throughout the proceedings. A DCPP caseworker assigned to the termination case, Scott, spoke with Richard at his mother's house on June 17, and informed him of the July 10 pre-trial conference and the July 17 and 18 trial dates. Scott then sent Richard a letter by regular and certified mail informing him of the July 10, 17, and 18 dates. Richard was

not at his mother's home when Scott visited the home on July 1, July 2, or July 12.

Because Richard does not identify which of his due process rights DCPP violated, and there is sufficient evidence in the record demonstrating Richard had notice of the termination proceedings, we find no unjust result.

Next, Richard frames an evidential argument on appeal as a due process claim, contending that the trial court improperly based certain findings upon: DCPP's unreliable records; Rita's hearsay statements to DCPP regarding Richard's history of substance abuse and domestic violence; and Laura's grandmother's hearsay statements to DCPP regarding adoption and kinship legal guardianship. Because the record shows Richard's counsel failed to object at trial to the admission of DCPP's records or the introduction of Rita and grandmother's hearsay statements, again we review the claim for plain error. R. 2:10-2.

Richard contends that DCPP's records are unreliable. As an example, Richard states that "a [DCPP] caseworker entered six months' worth of [DCPP] business records on a single day[,]" referencing contact sheets made between September 18, 2023 and February 16, 2024. Richard argues that "this course of conduct calls into the question [sic] the reliability of the [DCPP's] business

21

records in this case" because "[t]he admissibility and evidentiary reliability of of business records is based on their contemporaneous creation."

Rule 5:12-4(d) states "the [DCPP] . . . shall be permitted to submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants. Conclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal." DCPP reports are generally admissible under the N.J.R.E. 803(c)(6) business record exception to hearsay. N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 495 (App. Div. 2016). Because "requiring all [DCPP] personnel having contact with a particular case to give live testimony on all the matters within their personal knowledge would cause an intolerable disruption . . . it becomes necessary to allow certain evidence to be produced in a hearsay form." Id. at 496 (alteration in original) (quoting In re Guardianship of Cope, 106 N.J. Super. 336, 343 (App. Div. 1969)). Therefore, statements to the report's author "by [DCPP] 'staff personnel (or affiliated medical, psychiatric, or psychological consultants), [made based on] their own first-hand knowledge of the case, at a time reasonably contemporaneous with the facts they relate, and in the usual course of their duties with the' [DCPP]" are admissible. Ibid. (second alteration in original) (quoting Cope, 106 N.J. at 343).

Here, Scott testified as DCPP's custodian of records for this case and her testimony was based on her personal knowledge and DCPP's records in evidence. Richard does not argue on appeal that the record DCPP relied on to establish Richard's history of domestic violence and drug use was not contemporaneously made, nor does he specify any other records the trial court relied on to make its factual findings that would have been inadmissible. We discern no plain error.

Richard also argues that Rita's statements about him which were introduced at trial were inadmissible hearsay. He contends that the trial court's findings regarding his selling and use of drugs, and his history of domestic violence, "were based exclusively on statements allegedly made by [Rita] to the [DCPP] as documented in the [DCPP's] record prior to the date on which the testifying caseworker was involved with the family." We turn to the applicable law.

"[E]ven if a document 'is admissible as a record of regularly conducted activity,' statements by others reported by the author of the document 'are hearsay-within-hearsay,' each level of which . . . requires a separate basis for admission into evidence." N.T., 445 N.J. Super. at 487 (internal quotation marks omitted) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369,

375 n.1 (2010)). Thus "[a] 'hearsay statement[] embedded in [DCPP] records' from persons other than [DCPP] personnel and affiliated professional consultants 'may not be admitted unless it satisfies an exception to the hearsay rule.'" Ibid. (first and second alteration in the original) (quoting N.J. Div. of Child Prot. & Permanency v. B.O., 438 N.J. Super. 373, 385 (App. Div. 2014)). "The trial court must 'fully assess the evidential issues inherent in the [DCPP's] submission of documents which include statements by others than [DCPP] workers.'" Ibid. (quoting N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 468 (App. Div. 2014)).

A belated objection to hearsay statements "is barred by the invited error doctrine." N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 348 (App. Div. 2016). The invited error doctrine "operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 340 (2010) (quoting Brett v. Great Am. Recreation, 144 N.J. 479, 503 (1996)). The belated objection would otherwise deprive the litigant's adversary the opportunity to: (1) overcome the objection; (2) take steps to satisfy the evidentiary requirements needed to admit the evidence; or (3) present alternative evidence. Id. at 341.

Rita did not testify at trial. DCPP relied on Scott's knowledge of DCPP's reports to establish the fact that Richard sold drugs and committed acts of domestic violence against Rita. DCPP does not dispute the fact that it was Rita who reported Richard's domestic violence and use of drugs. Those statements were then incorporated into DCPP reports. Richard's counsel did not object to this at trial. To the extent that Rita's double hearsay statements are not protected by the invited error doctrine, J.D., 447 N.J. Super at 348, the plain error standard of review truncates further inquiry. The trial court's reliance on Rita's statements to make findings regarding Richard's history of domestic violence, substance abuse, and distribution of drugs did not have a "clear capacity for producing an unjust result." N.S., 412 N.J. Super. at 622. The record clearly shows that Richard's conduct leads to a clear inference by the fact-finder that he showed no interest in determining whether he was Laura's biological father. We discern no unjust result here.

Finally, Richard argues that "where the crux of [DCPP's] argument in support of termination of [Richard's] parental rights is that [grandmother's] desire is to adopt Laura, then, in order to satisfy its heavy evidentiary burden, [DCPP] is required to present that caregiver as a sworn witness at trial." We find this argument without merit, and comment briefly.

DCPP's trial strategy did not hinge upon production of the grandmother to testify and explain her desire to adopt Laura.  DCPP caseworker, Scott, testified credibly to her conversations with the Laura's grandmother and her desire to adopt.  Richard concedes that "[grandmother's] preference [was] not dispositive (or even relevant) . . . ."  DCPP's strategic choice to not call Laura's grandmother at trial was not clearly capable of producing an unjust result.

B.

We reach Richard's claim that DCPP failed to meet its burden of proof by clear and convincing evidence under N.J.S.A. 30:4C-15.1(a).

"The first two prongs, N.J.S.A. 30:4C-15.1(a)(1) and (2), are 'the two components of the harm requirement' and 'are related to one another.'"  N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (quoting D.M.H., 161 N.J. at 379).  "Therefore, 'evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child.'"  Ibid. (quoting D.M.H., 161 N.J. at 379).

Under the first prong, "the [DCPP] must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'"  N.J. Dept. of Child. & Family Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting

K.H.O., 161 N.J. at 352). DCPP need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting D.M.H., 161 N.J. at 383). Although courts have determined that drug use alone is not enough to show harm, these issues in the long-term often impact multiple issues affecting a child's well-being. N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 221-22 (App. Div. 1996). "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379.

Under prong two of N.J.S.A. 30:4C-15.1(a), DCPP must prove by clear and convincing evidence that "the parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The court may also consider "parental dereliction and irresponsibility, such as the parent's . . . inability to provide a stable and protective home or support for the child." L.J.D., 428 N.J. Super at 483 (quoting K.H.O., 161 N.J. at 353). This inquiry is meant to evaluate if the parent has overcome the initial harm that has endangered the child and if the parent would be able to continue to parent without exposing the child to additional and

recurring harm.  N.J. Div. of Child Prot. & Permanency v. R.G., 217 N.J. 527, 557 (2014).

The ample record shows that DCPP proved the first two prongs by clear and convincing evidence under N.J.S.A. 30:4C-15.1(a).  Among other things, DCPP has shown:  Laura has been and continues to be harmed by Richard's continued absence in her life and his failure to establish a parental relationship with Laura; Richard has not attempted to see Laura once since her birth; Richard concedes on appeal that he left the care of Laura to others for nearly two years; Richard has not participated in planning visits with Laura; that it was unable to locate Richard for a time; and that when Richard was found by DCPP at one point, he was living in his mother's backyard.  We conclude that the trial court did not commit error when it found DCPP satisfied prongs one and two by clear and convincing evidence.

Richard does not challenge the trial court's ultimate legal findings under the first two prongs.  Instead, he challenges the support for the trial court's findings by identifying certain inconsistencies in the record.  For the first time on appeal, Richard contends that the court mistakenly found that:  he had a history of domestic violence; his housing situation was unstable; he failed to

participate in evaluations; and the DCPP attempted to facilitate visitations between him and Laura.

We do not consider issues not raised before the Family Part "unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." N.J. Div. of Youth & Fam. Servs. v. B.H., 391 N.J. Super. 322, 343 (App. Div. 2007) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229 (1973)). As these arguments are being raised for the first time on appeal, we are not obligated to consider them, and we decline to do so here.

Prong three requires DCPP to have "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court [must have] considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

Richard argues that DCPP did not demonstrate by clear and convincing evidence that it made "reasonable efforts" to provide him services.

"Reasonable efforts" include, but are not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation."

[N.J.S.A. 30:4C-15.1(c).]

Courts do not measure reasonableness by the "success" of the efforts. N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 90 (App. Div. 2013) (quoting D.M.H., 161 N.J. at 393). What is reasonable "depend[s] on the facts and circumstances of each case." R.G., 217 N.J. at 557.

Two facts are pivotal here, in our view: Richard's reluctance to receive DCPP services until it was determined that he was Laura's biological father and DCPP's inability to contact Richard.

Among other things, the record shows that: Richard refused to receive services until he took a paternity test; Richard failed to attend scheduled paternity tests on February 3 and 17, 2023, April 19, 2023, February 12 and 27, 2024, and July 1, 2024; and when asked on one occasion directly whether he would attend a paternity test, Richard refused.

The record further shows DCPP could not reach Richard. After receiving Richard's phone number on January 29, 2024, DCPP attempted to remind Richard of his February 12, 2024 paternity test, only to receive a message indicating that Richard's phone had "calling restrictions."

Given the substantial record concerning Richard's failure to conduct a paternity test and his unwillingness to make himself available to DCPP, we conclude the trial court did not commit error when it found by clear and convincing evidence that DCPP has met its burden of proof to show reasonable efforts under prong three.

As to alternatives, the record shows that DCPP investigated kinship legal guardianship (KLG) alternative options, but no family members qualified. The court found "[DCPP] assessed multiple other potential placements, but they were all ruled out or basically chose to leave [Laura] with her maternal grandmother." On this record we cannot conclude the court erred by finding DCPP considered alternatives to terminating Richard's parental rights.

Under prong four, termination of parental rights must "not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The issue is "whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J. at 108. Consideration of a child's bond with resource parents is permitted to ensure "the State's parens patriae obligation to protect the welfare of children." D.C.A., 256 N.J. at 27. Generally, DCPP's proofs should include testimony by an expert who has had an opportunity to make a "comprehensive, objective, and informed evaluation of the child's relationship

with the foster parent," id. at 22 (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)), and the court must also consider "parallel proof relating to the child's relationship with his or her natural parents in assessing the existence, nature, and extent of the harm facing the child," N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 440 (App. Div. 2009) (quoting J.C., 129 N.J. at 19). However, where the termination is "not predicated upon bonding, but rather reflect[s] [the child's] need for permanency and [the biological parent's] inability to care for [the child] in the foreseeable future," a lack of a bonding evaluation is not fatal to DCPP's case. See N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593-94, 677 A.2d 1170 (App. Div. 1996).

Here, the trial court determined that the "termination of parental rights will not do more harm, finding that "it would cause far more harm to [Laura] if she was separated from her resource parent, as the resource parent is the only home she's ever known. And it is a safe and thriving home." The court's determination is well supported by the record, and we discern no error.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division